No. 27,678.

DANIEL A. JERALD, *Appellant,* v. N. W. HOUSTON, *Appellee.*

(261 Pac. 851.)

SYLLABUS BY THE COURT.

1. LIBEL AND SLANDER—*Effect of Statutory Definition.* The statutory defini-
   tion of libel in the criminal code did not abrogate the common-law distinc-
   tion in civil actions between libel *per se* and libel *per quod.*

2. SAME—*"Wrath" Defined.* The statutory definition of libel includes defama-
   tion which tends to provoke wrath. *Held,* the word "wrath" means not
   merely anger, but violent anger.

3. SAME—*Actionable Character of Article—Question of Law.* Whether a news-
   paper article is libelous *per se* is a question of law for the court.

4. SAME—*Actionable Character of Article—Construction of Newspaper Article.*
   In determining whether a newspaper article is libelous *per se,* headlines and
   the body of the article must both be regarded. Each statement must be
   considered in connection with the others, and the whole must be fairly and
   reasonably construed.

5. SAME. A newspaper article considered, and held not to be libelous *per se.*

6. SAME—*Article Libelous Per Quod—Necessity of Proof of Special Damages.*
   At the trial of an action for libel by the newspaper article referred to, no
   proof of special damages was offered. *Held,* a demurrer to plaintiff's evi-
   dence was properly sustained.

Appeal from Cherokee district court; JOHN W. HAMILTON, judge. Opinion
filed December 10, 1927. Affirmed.

*Charles Stephens, F. E. Dresia, Hubert Horning,* all of Columbus, and *F. J.
Oyler,* of Iola, for the appellant.

*Fred A. Walker* and *C. B. Skidmore,* both of Columbus, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one for damages for libel. A de-
murrer was sustained to plaintiff's evidence, and he appeals.

The district court sustained a demurrer to plaintiff's petition,
plaintiff appealed, the judgment was reversed, and the case was
remanded for trial. (*Jerald v. Houston,* 120 Kan. 3, 242 Pac. 472.)
At the trial witnesses for plaintiff testified concerning how they
understood the article: That plaintiff had falsified; that plaintiff
was crooked; that plaintiff was getting too much from the railroad

Libel and Slander, 36 C. J. pp. 1148 n. 38, 1150 n. 73, 1157 n. 71, 1166 n. 50;
37 C. J. pp. 36 n. 26, 69 n. 46, 99 n. 90, 101 n. 29; 17 R. C. L. 262, 313, 424.

company—was trying to collect something which he ought not to; that plaintiff was trying to get the best of ·the railroad company— was trying to get more money for his land than it was worth. Plaintiff testified 'the article made him mad, made him ashamed to meet people, he could not sleep at night, and people shunned him. Early in the trial the court announced that in its opinion the case was one of libel *per quod*, and not *per se*. No proof of special damages was offered, and in sustaining the· demurrer to plaintiff's evidence the court said:

"Under the view I take of'this case and have taken all the way through, as held in the first instance, the article was not libelous *per se*. I later held that where the article was not libelous *per se*, specific damages should be proven. I still think that is the law. I don't believe it has been proven in this case and, therefore, there is nothing for the jury to decide. The demurrer will be sustained."

Unless the article were libelous *per se* it was necessary that plaintiff prove special damages in order to recover. Plaintiff does not contend to the contrary, and does not contend he offered any proof of special damages. Plaintiff's contention is the article was libelous *per se*, and that is the only question to be decided. If the article was libelous *per se* the case should have gone to the jury for assessment of general damages. If not, the demurrer to the evidence was properly sustained, because special damages were not proved.

Plaintiff contends the article was libelous *per se* because this court so decided in the former appeal. The contention is not well founded. The ground of the demurrer to the petition was not that the petition failed to state a particular kind of cause of action, but that it failed to state any cause of action. There was some discussion in the former opinion of the question whether the article was libelous *per se*. One question was whether the article charged plaintiff with a crime in connection with assessment of his land. It was shown there may be defamation without charge of crime, and it was said that, while the offensive language, critically analyzed, did not charge crime, that fact did not make the petition demurrable. The decision of the court on the subject was stated in the second paragraph of the syllabus: ·

"Rule followed that a cause of action for libel may be stated although the alleged libelous article did not charge the aggrieved party with the commission of a crime defined by statute." (*Jerald v. Houston,* 120 Kan. 3, syl. ¶ 2, 242 Pac. 472.)

The opinion contained other observations bearing on whether the

printed words were libelous *per se*. In one part of the opinion it was said the question whether the article was libelous *per se* or *per quod* was academic, because the article plus the allegations contained in the petition made out a cause of action for defamation. The decision of the court was stated in the third paragraph of the syllabus:

"In an action for damages for libel, the allegations of plaintiff's petition, together with the alleged libelous matter, considered, and held to state a cause of action against a demurrer thereto." (Syl. ¶ 3.)

The writer dissented because he was of the opinion the allegations of the petition added nothing to the article, and the article itself was not actionable.

In the former opinion the need to allege special damages in order to state a cause of action when the article complained of is not libelous *per se* was not mentioned. Defendant did not move in the district court for a specification of items of damage, he did not suggest to this court that the petition was demurrable for want of a proper allegation of special damages, and the court was not authorized to speak on the subject.

Plaintiff contends this court reaffirmed its position that the article was libelous *per se* in the case of *Knapp v. Green,* 123 Kan. 550, 256 Pac. 153, wherein the opinion quoted at some length from the former opinion in this case. The quotation consisted of that part of the former opinion devoted to showing it is not necessary for an article to charge commission of crime in order to be libelous. To illustrate that subject, decisions of this court extending from *Hetherington v. Sterry,* 28 Kan. 426, to *Rohr v. Riedel,* 112 Kan. 130, 210 Pac. 644, were reviewed, in which the court had held articles to be libelous *per se* although no crime was charged. It was not necessary to go over the same ground again, and the collation of cases already made was used to show that the article in *Knapp v. Green* was libelous *per se.*

There is nothing else in plaintiff's brief bearing on the question whether the article was libelous *per se.* A quotation from the opinion in the case of *Hanson v. Krehbiel,* 68 Kan. 670, 75 Pac. 1041, appears, but it is confined to a discussion of the subject of general and special damages. Plaintiff does not contend the evidence showing how readers of the article understood it may be considered in solving the question whether the article was libelous *per se.* He says the evidence was introduced to meet the ruling of the district

court that the action was for libel *per quod,* and not *per se.* If so, the proof was not extended far enough to establish special damages, which are clearly distinguished from general damages in the opinion in the case of *Hanson v. Krehbiel.* It is not the understanding of one or several readers which determines whether an article is libelous *per se.* The question is whether the words on their face, without explanation or extrinsic proof, would necessarily, or as a natural and immediate consequence, cause injury. What somebody understood is immaterial (*Dahl v. Hansen,* 152 Ia. 555, 559; *Thompson v. Sun Pub. Co.,* 91 Me. 203, 207; *J. A. & R. A. Reid v. Prov. Journal Co.,* 20 R. I. 120, 122; *Williams v. Hicks Printing Co.,* 159 Wis. 90, 106), and the question is one of law for the court.

"Whether a publication is libelous *per se* or the language thereof will bear the interpretation or convey the meaning ascribed to it in the innuendo, are questions of law for the court." (*State v. Huff,* 96 Kan. 632, syl. ¶ 2, 152 Pac. 642.)

The action is one for damages resulting from a tort. The protected interest is good reputation. The claimed invasion is publication of defamatory words. The invasion must cause damages. In the case of *Knapp v. Green,* 123 Kan. 550, 256 Pac. 153, the definition of libel found in the criminal code was quoted, and the rule was applied that if libel is defined by statute any language fairly included in the definition is libelous *per se,* citing *Schomberb v. Walker,* 132 Cal. 224, 226; *Stevens v. Snow,* 191 Cal. 58, 62; and *Guisti et al. v. Galveston Tribune,* 105 Tex. 497, 504.

What help does the statute give in determining whether the article was intrinsically of such a character that it must have caused damages as plaintiff asserts?

In Pollock and Maitland's History of English Law (vol. 2, p. 535) we read that the Lex Salica decreed that if a man called another "wolf" or "hare," he should pay the other three shillings; and if a man called a woman "harlot," and could not prove it, he should pay her forty-five shillings. Here are three actionable words, the speaking of which was regarded as causing specified damages. In the same book we read (p. 536) that it was written in the Norman Custumal that if a man falsely called another "thief" or "manslayer," he should pay damages, and, holding his nose with his fingers, should publicly confess himself a liar—the prototype of modern newspaper retraction. Here are two more actionable words presumably causing damages, but the amount is not fixed. From multiplication of single

instances like these our law of slander and libel developed. Other bad words and defamatory expressions caused harm to be repaired by damages to the injured person, and the public interest required protection, which was afforded by public prosecution. When the time came to state a law of libel, attempts were made to generalize by way of definitions, and as the law grew, definitions became more and more elaborate. The writer was recently presented with an original copy of the second edition of Blount's Law Dictionary, printed and bound in 1690. The first edition appeared in 1670, 257 years ago. In this dictionary, libel is defined as "A scandalous report of any man cast abroad, or otherwise unlawfully published in writing."

Blackstone treats slander and libel by definition explained by enumeration:

"Lastly: injuries affecting a man's *reputation* or good name are, first, by malicious, scandalous and slanderous *words,* tending to his damage and derogation. As if a man maliciously and falsely utter any slander or false tale of another; which may either endanger him in law, by impeaching him of some heinous crime, as to say that a man hath poisoned another, or is perjured; or which may exclude him from society, as to charge him with having an infectious disease; or which may repair or hurt his trade or livelihood, as to call a tradesman a bankrupt, a physician a quack, or a lawyer a knave. Words spoken in derogation of a peer, a judge, or other great officer of the realm, which are called *scandalum magnatum,* are held to be still more henious.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"A second way of affecting a man's reputation is by printed or written libels, pictures, signs, and the like; which set him in an odious or ridiculous light, and thereby diminish his reputation. . . . What was said with regard to words spoken will also hold in every particular with regard to libels by writing or printing, . . ." (3 Blackstone's Com. 123, 125, 126.)

Chancellor Kent adopted the definition of libel found in two Massachusetts cases:

"A libel, as applicable to individuals, has been well defined to be a malicious publication, expressed either in printing or writing, or by signs or pictures, tending either to blacken the memory of one dead, or the reputation of one alive, and expose him to public hatred, contempt, or ridicule." (2 Kent's Com. 16.)

The Kansas legislature of 1868 framed the definition which is still a part of the crimes act:

"A libel is the malicious defamation of a person, made public by any printing, writing, sign, picture, representation or effigy, tending to provoke him to wrath or expose him to public hatred, contempt or ridicule, or to deprive him

of the benefits of public confidence and social intercourse, or any malicious defamation made public as aforesaid, designed to blacken and vilify the memory of one who is dead, and tending to scandalize or provoke his surviving relatives and friends." (R. S. 21-2401.)

The code of civil procedure does not define libel. This fact, however, does not set the law of libel at large in civil cases. It may be assumed that whatever is punishable as libel, in the interest of the public welfare, may be the basis of a civil action of tort for general damages when such damages may be presumed, and for such special damages as in fact resulted. The purpose of the legislature in stating its definition was the same as the purpose of Kent and Blackstone and Blount: to stabilize and standardize the meaning of the term "libel," in order to indicate the extent to which the law protects reputation. When taken over into the law of torts, the definition is merely an authoritative statement of the meaning of a term. The definition was not confined to those defamations only which the authorities had held to be actionable, such as those in Blackstone's enumeration, but was extended to include any kind of defamation which might fairly be covered by the language used. But the common law of libel in civil actions was not abrogated, and in particular the common-law rules relating to libel *per se* and libel *per quod* were not expunged. If a statement printed in a newspaper on its face defames in any of the ways stated in the definition, it is libelous *per se;* but if the statement does not on its face defame, and in order to make it defamatory it is necessary to show how it did hurt, it is not libelous *per se.*

The views just expressed accord with those of the California court. The civil code of California contains a definition of libel. In the case of *Schomberg v. Walker,* 132 Cal. 224, cited in the opinion in *Knapp v. Green,* the syllabus reads:

"The definition of libel in our code is but a statement of the common-law rule, that any words will be presumed defamatory, or libelous *per se,* which expose the plaintiff to hatred, contempt, ridicule, or obloquy, or which tend to injure him in his profession or trade, or to cause him to be shunned or avoided by his neighbors. . . .

"Language fairly included in the statutory definition of libel is libelous *per se.* It is only where the meaning is *covert* that averment and proof of special damage is required." (p. 224.)

In the opinion it was said:

"The definition of libel in our code is taken from Field's New York Civil Code (sec. 29), and is but a statement of the common-law rule as given in the

cases there cited. (2 Kent's Com. 17 [and other authorities].) The effect of these and other cases is thus stated—almost in the language of the code—by Mr. Odgers: 'In cases of libel, any words will be presumed defamatory which expose the plaintiff to hatred, contempt, ridicule, or obloquy, which tend to injure him in his profession or trade, or to cause him to be shunned or avoided by his neighbors.' . . .

"Where there is a statutory definition—it has been said by this court—'language which is fairly included in such definition is libelous *per se*. It is only when the libelous meaning of the publication is *covert*—not apparent on the face of the language used—that averment and proof of special damage is required.'" (pp. 226, 227.)

The statement that when language is fairly included in a statutory definition it is libelous *per se* was taken from the opinion in the case of *Tonini v. Cevasco*, 114 Cal. 266. In that case the statement was that Tonini had not moved away, but had been discharged by a named firm for conduct not irreprehensible. The syllabus reads:

"The publication of a false statement that the plaintiff was discharged from his employment for reprehensible conduct, is libelous *per se,* as tending naturally to expose him to obloquy, and to injure him in his occupation, and no averment or proof of special damage is required in such case, such proof being only required when the libelous meaning of the publication is covert, and not apparent on the face of the language used." (Syl. ¶ 5.)

In the opinion, after discussing the distinction in gravity between spoken and written words, the court said:

"However, in most of the states there is a statutory definition of libel; and in such case language which is fairly included in such definition is libelous *per se*. It is only when the libelous meaning of the publication is covert—not apparent on the face of the language used—that averment and proof of special damage is required.

. . . . . . . . . . . . .

"We think that the language charged, upon its face tended naturally, necessarily and proximately to produce some, at least, of the results mentioned in section 45 of the code above quoted; . . . and that, therefore, no averment or proof of special damage was necessary." (pp. 271, 273.)

The decision in the case of *Stevens v. Snow*, 191 Cal. 58, cited in the opinion in *Knapp v. Green*, was in accord with the earlier decisions of the California court.

The civil code of Texas contains a definition of libel which was interpreted in the case of *Guisti et al. v. Galvestion Tribune*, 105 Tex. 497, cited in the opinion in *Knapp v. Green*. In the course of the opinion in the Guisti case the court made these declarations:

"We think it clear that in the enactment of the law the purpose was not only to make definite what constitutes actionable libel in this state, but to ma-

terially modify the doctrine of the common law upon that subject. . . .
Under the present law it is not necessary to the right to maintain an action
for a publication not libelous *per se* to allege or prove special damages. . . .
In this particular the common-law rule has been modified. . . . So that we
are constrained to hold . . . that the manifest purpose of the legislature
in enacting this law was to cover the entire subject of libel as applied to civil
actions, without regard to the rules of the common law and holdings of the
courts on the subject, and to materially enlarge the rights of those who may
be the subject of libelous publications. . . .

"But, irrespective of the penal code, the present statutory law makes any
printed or written statement tending to impeach the virtue of any person in
this state actionable as a libel, without regard to the allegation or proof of
special damages." (pp. 504, 505.)

This view of the effect of statutory definition of libel never has
been recognized in this state, and was not adopted in the opinion
in the case of *Knapp v. Green,* which was decided according to
common-law principles:

"Unless the language used was actionable *per se,* a cause of action is not
stated because special damages are not pleaded." (*Knapp v. Green,* 123 Kan.
550, 551, 256 Pac. 153.)

Politics become odious unless those who, in the exercise of their
political privileges, assume leadership act upon public considera-
tions. The article complained of in *Knapp v. Green* pictured Knapp,
postmaster, as political boss in action in the characteristic manner
which has made the boss system in politics anathema wherever it
prevails. The question was, Did the article on its face necessarily,
or as a natural and proximate consequence, tend to invade Knapp's
legally protected interest in good reputation? If so, it was not
necessary to plead special damages; damages would be presumed.
We have the same question in this case.

In the former opinion in this case the statement of facts intro-
ducing the article complained of contained an error which gave a
wrong cast to the article. It was said plaintiff's farm was assessed
at $35.75 per acre, that 6.06 acres were condemned, that plaintiff
was awarded $1,312 as damages "for the land so taken," that plain-
tiff appealed, and that the jury returned a verdict for $2,300. The
board of appraisers did not allow $1,312 as damages for the 6.06
acres of land taken. The petition alleged the appraisers appraised
the damages to plaintiff's farm at $1,312. The article made the same
statement, and what price per acre the appraisers placed on the
land taken did not appear in the petition or in the article. At the

Jerald v. Houston.

trial of this case, testimony of witnesses given at the trial of the
appeal from the appraisers' award was read, showing that the jury
had before it an abundance of evidence relating to damage to the
farm as a whole, and the method of proving damages was to show
value per acre of the farm before condemnation, and value per acre
after condemnation, considering numerous factors of depreciation
caused by the railroad cutting the land in two. The article follows:

"Daniel A. Jerald Gets Judgment Against N. E. O.—Will Probably be Appealed—Jerald Awarded $2,300 by Jury for Railway Company Taking Up
6.06 Acres of Land with Right of Way.

"How much is an acre of land worth in the eyes of a jury, when the owner
swore it was worth $35.75 per acre when the assessor called?

"How much should a street-car company be stung, which puts a line of rails
across a farmer's land, even though it increases the value of every acre of the
farm, by reason of bringing the farmer's family in closer touch of town, and
affording him an easier means of transporting his products to market?

"A verdict in the district court yesterday, which the company's legal
representatives say is ridiculously excessive in damages assessed, will be appealed to the supreme court.

"The case referred to is that of Daniel A. Jerald against the Northeast
Oklahoma Railway Company, in which Jerald appealed from an appraisers'
award of damages.

"The Jerald farm is composed of 150 acres and is located north of the
Taylor place, a few miles south of Columbus. The right of way of the N. E. O.
crosses it on a quarter section line and takes up 6.06 acres of land.

"At the time the right of way was secured through condemnation proceedings
some time ago, the board of appraisers, consisting of three entirely disinterested
parties, placed the actual damage to the farm at $1,312.

"However, the plaintiff evidently considered that his farm had been damaged
in excess of the amount given him and he employed the law firm of Stephens
& Dresia and brought action in the district court.

"Jerald introduced a score of witnesses yesterday to testify that his farm
had been damaged in excess of the amount he had been awarded by the board
of appraisers.

"Witnesses for the street-car company also testified in regard to the amount
of damages sustained. Their opinion of the amount of damage ranged from
$5 to $7.50 per acre.

"It was brought out in testimony during the trial that the farm had been
assessed at $35.75 per acre last year.

"The street-car company was represented by a Miami lawyer and Al F.
Williams and Don Elleman of this city."

In determining whether the article had but one fair meaning, and
as a necessary or natural and proximate consequence would cause
damage, the article must be read as a whole. Each statement must

be considered in connection with the others, and the whole must be fairly and reasonably construed. (*Dever v. Montgomery,* 89 Kan. 637, 640, 132 Pac. 183.) So considered, the article was a report of a judicial proceeding with an account of how it arose and how it ended, captioned by headlines and containing comment. The farm of 150 acres had been assessed the year before at $35.75 per acre, and Jerald had sworn to that valuation when the assessor called. The railroad condemned 6.06 acres for right of way, and the board of appraisers placed actual damages to the farm at $1,312. Jerald employed attorneys and brought action in the district court. At the trial Jerald produced a score of witnesses to testify that the farm had been damaged in excess of the amount awarded by the board of appraisers. Witnesses for the street-car company testified regarding amount of damages sustained, and in their opinions the amount of damages ranged from $5 to $7.50 per acre. The assessed value of the land was shown in evidence. The jury gave Jerald $2,300. The railroad company was represented by certain attorneys.

The article says the board of appraisers placed the actual damages to the farm at $1,312. This language cannot be distorted to mean that the board of appraisers valued the 6.06 acres of land taken at $1,312, or more than $216 per acre. The article said Jerald considered his farm had been damaged in excess of the amount given him, not that he considered he should have more than $216 per acre for the 6.06 acres. The article said Jarrel produced witnesses to swear that the farm had been damaged in excess of the amount allowed by the board of appraisers. Witnesses for the railroad company testified in regard to amount of damages sustained, and in their opinions the amount was from $5 to $7.50 per acre. From $5 to $7.50 per acre for what? For 6.06 acres taken, making the amount of damages from $30.30 to $45.45, or for the farm, making the damages from $750 to $1,125—the latter figure in the neighborhood of the appraisers' award? All that is necessary in order to grasp the meaning of these portions of the article is to read them—not to read them critically, but just to read them as the story is told. The court declines to assume that readers of ordinary intelligence would give them the twists which have been indicated, and defendant may not be compelled to pay damages if some superficial or careless reader did so.

The account of the evidence which was introduced at the trial

closed with the statement that the farm had been assessed at $35.75 per acre the year before. Then came the verdict for $2,300, and for what? The headlines attracted attention to the verdict for $2,300, not as damages resulting from the railway going through the farm, but as damages for taking up 6.06 acres of land with right of way, and the first sentence of the body of the article focused attention on the value of an acre of land. It is the practice of some newspapers deliberately to put poison in a headline and follow it with a weak antidote in the body of the article. This is done for the consumption of those who do not look below the headlines, and the expedient may go far enough to make a headline libelous, notwithstanding what follows. In this instance the headlines did not contain the news. They merely attracted attention to the news. The body of the article must be read to know what happened. The average reader was obliged to do that, and when that is done, the article as a whole bears but one meaning. Jerald obtained the verdict of a jury for $2,300, not for 6.06 acres of land at a price of $379.53 per acre, but as damages to his 150-acre farm. What was there about that to bring obloquy on Jerald?

The first and second sentences of the body of the article were not directed against Jerald. The first query was not, How much is an acre of land, which the owner valued under oath at $35.75 when the assessor called, worth in the owner's eyes after a railway company takes up 6.06 acres of it with a right of way? The query was, How much is an acre of land, which was so valued by the owner, worth in the eyes of a jury? The next inquiry was, How much should a street-car company be "stung" which puts a line of rails across a farmer's land? Looking further into the article, the witnesses for the railway company estimated damages to the farm. The appraisers were spoken of as "three entirely disinterested parties." They appraised damages to the farm at $1,312. So far there is not the slightest indication that anybody had not expressed an honest opinion. Then the jury, after listening to a score of witnesses produced by Jerald, awarded approximately one thousand dollars more as damages to the farm than the appraisers had allowed. The whole tenor of the article was not that Jerald had willfully and corruptly undervalued his land for taxation, but that the jury had returned a verdict for a grossly excessive sum. The article did not suggest that Jerald was a witness at the trial, and the article had no tendency to

impute to him the crime of perjury in returning his land for taxation, assuming perjury could be so committed, which was not possible under the law. It would be idle to assert that the statement in the article that Jerald produced a score of witnesses who testified the farm had been damaged in excess of the amount allowed by the appraisers, indicated wholesale subornation of perjury.

The essence of the imputation against Jerald was that, after he valued his land under oath for purposes of taxation, and after he had been awarded damages to his farm by three entirely disinterested appraisers, he proceeded to "sting" the railroad company by a verdict for $2,300, which the attorneys for the company said was ridiculously excessive; and he did this, notwithstanding the fact that putting the line of rails across his farm increased the value of every acre of it, by bringing his family in closer touch with town and affording easy transportation facilities to market. But the article set forth in detail the precise means by which this result was accomplished. Jerald hired attorneys, brought an action in the district court, a trial occurred, at which the railroad company was represented by attorneys, and a verdict was returned by a jury after listening to evidence, the nature of which was summarized. Without debating the matter, this court declines to hold that, as a matter of law, the article would tend to expose plaintiff to public contempt, hatred or ridicule, or deprive him of the benefits of public confidence and social intercourse.

The statutory definition includes defamation which tends to provoke wrath. The provision is reminiscent of days when defamation was followed by use of the horsewhip and pistol. As employed in the statute, wrath means not merely anger, but violent anger (Webster's New International Dictionary), and the court holds the article was not of a kind to arouse a person to such a pitch that he would likely be distraught with rage and fury.

The judgment of the district court is affirmed.

DAWSON, J., dissenting.

HARVEY, J. (concurring): I concur in affirming the judgment of the court below, but do not concur in the opinion as written. My views may be thus stated: There is a decided distinction between the crime of libel in this state and the civil liability for libel or

slander. The crime of libel is defined by our criminal statute (R. S. 21-2401). It is a statutory crime, for all crimes known to our law are statutory crimes; that is, we have no common-law crimes in this state. Whether the acts defined by our criminal statute did or did not constitute libel at common law is of no importance in a criminal prosecution for libel in this state, for the prosecution is under the statute, and the statutory definition of libel governs. It must be noted, also, that our statute defining the crime of libel makes no distinction between libel *per se* and libel *per quod;* neither of these terms is used in the statutè. If the acts defined by the statute are committed they constitute the crime of libel, and that is about all there is to libel as a crime.

The civil action of damages for libel or slander is a different thing. Libel, or slander, is defamation of character. Character was at common law, and is now, regarded as having value—a value which, if it were injured or destroyed by defamation, is capable of measurement in dollars. One at common law could sue for the damage sustained by him in the loss or injury of his character caused by the libel or slander of another, just as he could sue for damages resulting from the wrongful destruction or injury of his property. This is a common-law right of action which has always been recognized in this state. It exists independent of a statute defining libel as a crime. It existed before our statute defining libel as a crime was enacted, and would exist if that statute were repealed.

Now, in the civil action for damages for libel, or slander, the common law, and courts applying it, have always distinguished between libel and slander *per se* and *per quod.* The distinction is one which relates to the manner of pleading the libel or slander and to the nature of the proof necessary to sustain a judgment for damages. The rule in this respect has been and is that if the defamatory words complained of constitute libel or slander *per se,* special damages need not be alleged nor proved; it is sufficient to allege and prove general damages. But if the defamatory words complained of constitute libel or slander *per quod* only, then it was not sufficient for plaintiff to allege and prove general damages, but he is required to allege special damages and to sustain such allegations by proof. This distinction required definitions of those terms. Words actionable *per se* are such that their injurious character is a fact of common notoriety, established by the general consent of men, and the

courts consequently take judicial notice of it. They necessarily import damage. Other defamatory words are actionable only *per quod*. Damages may or may not have resulted from their use, hence it is necessary to allege and prove just what specific damage did result from their use.

And especially in this class of defamatory words the tendency of the law is not to encourage actions for damages. Applying these definitions to specific language it is easy to see, on the one hand, that language falsely imputing immorality or the commission of crime—at least the more heinous crimes—are libelous or slanderous *per se*. On the other hand, it is easy to see that many words and expressions, even though untrue, alleged to be defamatory, may or may not have resulted in any damage, depending upon the peculiar facts and circumstances of the case. These obviously, if they form the basis of an action for damages at all, are libelous or slanderous *per quod* only. Between these two extremes there may be many words or expressions which are somewhat difficult to classify, which may be said to be in the "twilight zone." The only practical way of determining in which class such terms must be placed is for the courts to decide, and the rules for the guidance of the courts is that if the injurious character of the language complained of is a fact of common notoriety, established by the general consent of men, so that the court can take judicial knowledge of it, they are libelous or slanderous *per se*, otherwise they are libelous or slanderous *per quod* only. Tested by this rule, I think it is clear that the language here complained of cannot be said to be libelous *per se*.

We should overrule *Knapp v. Green*, 123 Kan. 550, 256 Pac. 153. The rule of law stated in the syllabus of that case is, in my judgment, unsound, and the sooner we recognize it and say so the better it will be. There is no consistency in holding that the language complained of was libelous *per se* in that case while in this case it is libelous *per quod* only. In both cases it is clear that the editor was intending to "roast" the party named or referred to, perhaps hoping to make him mad and subject him to contempt and ridicule. Perhaps in each case the language complained of would have formed the basis of a criminal prosecution for libel. But with that question we are not here concerned. Both of these cases were civil actions for damages and are governed by the rules pertaining to such actions. In the one case the language imputed that the person re-

Jerald v. Houston.

ferred to was a political "boss" of his party or faction and was attempting by methods that were questionable to run political matters in his county in the interest of his party or faction. But the decision of this court in *Coleman v. MacLennan,* 78 Kan. 711, 98 Pac. 281, was that editors were adjudged to have a good deal of privilege in discussing matters of this kind. In this case the imputation was that the party named had obtained an excessive award of damages for the right of way of a railroad through his property. In neither case is the language complained of of a character that actual financial damages would necessarily result. They are therefore libelous only *per quod.*

One question in this case annoys me, but I think I have reached the correct solution of it. Early in the history of this case a demurrer was sustained to the petition for the reason that it did not state facts sufficient to constitute a cause of action. Plaintiff appealed. That judgment was reversed (120 Kan. 3, 242 Pac. 472), this court holding that the petition did state a cause of action. I concurred in that decision. The petition in fact did not allege special damages. The ruling of the court below sustaining the demurrer was good for that reason, but that question was not argued nor presented to this court in the former appeal. I have reread the record and briefs carefully and find that it was not mentioned as a reason for sustaining the ruling of the trial court on the demurrer. This court in a former appeal decided the questions that were presented and argued to it, and decided them correctly. Assuming they were the only reasons that had been, or could be, pressed for holding that the petition did not state a cause of action, the court reversed the case, holding that the petition did state a cause of action. Now that the case has been tried on that petition, which alleged only general damages, and general damages having been shown, it seems at first view that it is inconsistent to say that the plaintiff could not recover; but the reason is clear when we note, as we must, that the question whether the petition failed to state a cause of action because it did not allege special damages was not presented nor considered by this court at the former hearing. Hence our former decision is not controlling on that question.