CHAUFFEURS, TEAMSTERS AND HELPERS LOCAL UNION No. 795, *Appellee*, v. KANSANS FOR THE RIGHT TO WORK, a corporation, *Appellant*.

### No. 42,318

S. E. SMITH, *Appellee*, v. KANSANS FOR THE RIGHT TO WORK, a corporation, *Appellant*.

(368 P. 2d 308)

Opinion filed January 20, 1962.

*Marvin J. Martin,* of Wichita, argued the cause, and *John D. McBride,* also of Wichita, was with him on the brief for the appellant.

*Frank W. Hylton,* of Wichita, argued the cause, and was on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: These are actions for alleged libel. The trial court overruled demurrers challenging the sufficiency of the petitions, and the defendant has duly perfected an appeal from each of such orders, presenting as the sole question whether the respective petitions state sufficient facts to constitute libel *per se.*

Two separate actions were filed in the district court of Sedgwick County, Kansas. One was filed by the Teamsters Local doing business in Wichita under the caption "Chauffeurs, Teamsters and Helpers Local Union No. 795 v. Kansans for the Right to Work, a corporation." This case is docketed here as No. 42,319. This suit prays for judgment in the amount of $100,000 actual damages, together with $150,000 punitive damages. A second suit was filed by S. E. Smith, the business agent for this same Teamsters Local, under the caption "S. E. Smith v. Kansans for the Right to Work, a corporation," and is docketed here as No. 42,318. This suit prays for judgment in the amount of $100,000 actual damages, together with $150,000 punitive damages. These cases have been consolidated with a stipulation that the decision in No. 42,318 will be controlled by the decision in No. 42,319. Only the latter case has been abstracted and briefed for review by this court and our opinion will be confined to it.

On the 22nd day of July, 1959, the Wichita Local of the Teamsters Union mailed to certain trucking firms a letter advising these firms that the Teamsters intended to picket them beginning July 27, 1959. This letter was signed by S. E. Smith, as president and business representative of the Local Union.

On or about the 2nd day of August, 1959, Kansans for the Right to Work, a corporation, published in two Wichita newspapers *copies of the Teamsters' letter together with comments concerning the letter's real meaning and effect.* The publication in each of the two Wichita newspapers was identical. The Teamsters' letter as published reads as follows:

"CHAUFFEURS, TEAMSTERS, AND HELPERS
LOCAL UNION No. 795
Wichita 2, Kansas
July 22, 1959
"CERTIFIED MAIL—RETURN RECEIPT REQUESTED

"(Addressee's name deleted)

"Dear Sir:

"Local 795, I. B. T., has decided to embark upon a campaign to organize your office and clerical employees. To induce your employees to join this union, we shall begin to picket your establishment on or about the 27th of July, 1959. We assure you that the picketing will be entirely peaceful. We have instructed our pickets not to threaten, intimidate or coerce anyone. If there is any violation of those instructions, please advise us and we shall see to it that corrective action is taken immediately.

"We wish to make it clear to you that Local 795 does not at this time represent, and of course we do not claim to represent, a majority of your office and clerical employees. Local 795 does not ask you to recognize it as exclusive bargaining representative for your employees, or indeed, ask you to recognize it for any purpose at this time. The purpose of our picketing is solely to call to the attention of union members and supporters of organized labor that your office and clerical employees are not members of Local 795.

"We hope that the demonstration of support of Local 795 in its efforts to organize, which this picketing will produce, will persuade your employees to become members of our Local Union. When they do, they will join the thousands of other employees who are affiliated with the great International Brotherhood of Teamsters. In engaging in this picketing campaign, we are speaking for the members of our organization who are employed in businesses like yours and who feel the brunt of the unfair competition of your unorganized employees.

"This point we must emphasize. We are not making any demand upon your Company at this time to agree to or execute any contract with our Union covering any of your employees. Under the law your Company is permitted to recognize and bargain with our Local Union only after a majority of your employees have authorized the Union to represent them. Therefore, even if your Company should now or hereafter offer to recognize our Union or enter

into collective bargaining with us our Union would refuse such an offer and we would continue to refuse until your employees lawfully authorize us to represent them. Should your employees desire to join our Union, they may apply for membership at the office of Local 795, 417 East English, Wichita, Kansas, or ask one of the pickets for a membership application card which they can fill out and return to him. When we have received applications from a majority of your employees, we will contact your Company further.

"You should also understand that it is your right under the Constitution of the United States and under the National Labor Relations Act to advise your employees of the economic detriment which you and they will sustain as a result of the withholding of patronage from your concerns by union members and sympathizers as long as they remain non-members of our union.

"You may, in the exercise of your lawful rights, explain these detriments to your employees and urge them to apply for membership in the Union and thereby acquire for themselves and for your Company the good will of our Union and its friends. You may not, and we are sure that you will not, threaten to take economic reprisal against your employees, or grant them benefits, to coerce their choice in this matter. However, we feel sure that if your employees, who have been carefully taught to look to you for leadership on matters affecting their employment, are convinced that it is your sincere desire that they join the Union, they will quickly realize that acquisition of union membership at the earliest opportunity is in their best interest.

Yours very truly,

S. E. Smith, President and
Business Representative.

SES:pe"

Comments upon the foregoing letter as published appeared as follows:

#### "Is There Any Word for It But 'Blackmail?'"

"Mr. and Mrs. Citizen:

"At least six large trucking firms in Wichita are being picketed yet there is no strike, no contract negotiations, no nothing—except blackmail!

"What is happening in Wichita is in open disregard of the Kansas Right to Work law—another example of Hoffaism and the tactics of the puppet leaders who do Hoffa's bidding.

"The picketing in Wichita began after a letter from Sam Smith, local Teamster boss, was sent to the truck line operators. (Smith's letter is reproduced at the right.) It is doubtful if such a letter has ever before been seen in the long history of union boss attempts to deprive American working people of their freedom of choice—and force them to join unions or lose their means of livelihood.

"In absolute disregard of either employer or employee rights and wishes, Sam Smith's letter combines the work of the skilled writer and the ingenuity of the legal practitioner. Lest the full meaning of this letter be lost in its lengthy wordage, this is what the union boss is saying to the Wichita trucking firms:

"* 'We know the law, and the law says we can picket you as an exercise of free speech so long as we do it peacefully.

"\* 'We know, also, that our picket at your door will put you out of business because you will not be able to move goods so long as our picket is there.

" \* 'We are under no necessity to sell the union to your employees because you will compel them to join our membership as quickly as the picketing shoe starts to pinch.

"\* 'There is no occasion for us to use force and violence and risk possible injunction proceedings against us because you, Mr. Employer, will do our job for us. You'll have to—or go out of business.

"\* 'We don't care about what your employees think or want. They will join our union or they won't work for you.

"\* 'We don't care, either, for the supposed constitutional or moral rights of your employees. They lost their rights when the lawmakers and the courts ceased to protect them and delivered their economic destiny into our hands.'

"Picketing is a simple device. One two-dollar-a-day stranger carrying a picket sign for some union can literally stop business—any business—in its tracks. If continued, it can destroy the business against which it is directed.

"Picketing, as a means of advertising a legitimate labor dispute between employer and employee, is an acceptable device to most Americans. When used to effect the ends of a private organization which seeks only its own purpose without regard for the consequences to both employer and employee, it is a monster.

"This monster, Mr. and Mrs. Wichita can within a few days stop your flow of food, medicine and other vital necessities of everyday life. It can paralyze the City of Wichita, all the surrounding area, the State of Kansas—even spread throughout the nation.

"This monster can also throw thousands of people out of work, including regular rank and file members of the Teamsters who want no part of Sam Smith's action, who desire only to work and earn a living for themselves, their wives and their children.

"Let it be known that the Sam Smith letter did not originate with Sam Smith. The same identical letter, word for word, was sent more than two months ago to Chicago trucking companies by Teamsters Local 710 in that city.

"Also, let it be known that if Sam Smith wants to fight the Right to Work battle all over again, Kansans for the Right to Work is ready to go.

"Our organization is offering every resource at its command to those trucking firm employees who need and want our help. Public pressure must be brought to bear on Sam Smith through a flood of protests directed at him by open personal appeals to Governor Docking, the city manager and the mayor of Wichita—and through pledges of unqualified support to the trucking firm operators and their embattled office and clerical employees.

"Every member and friend of the Right to Work movement—every citizen who believes in personal freedom and who wants to protect himself and his family—is urged to act at once—by telephone, telegram, letter or personal calls—to force a halt to this type of blackmail picketing which is being used as a gangster gun in the ribs of business and its employees.

KANSANS FOR THE RIGHT TO WORK

P. O. Box 3038, S. E. Station                                        Wichita"

Four months later the Teamsters filed their petition in the district court. After various changes resulting from motions their third amended petition (hereafter referred to as the petition) was filed on the 22nd day of July, 1960. This petition by appropriate allegations identified the parties, and alleged the publication of the foregoing advertisement on or about the 2nd day of August, 1959, in the Sunday edition of The Wichita Eagle Newspaper and in the Sunday edition of The Wichita Beacon Newspaper, copies of which were attached and made a part of the petition. It alleged the circulation of the newspapers and the publications to many thousands of people throughout a several-states area. The petition then alleged:

"V.

"The publication of both said articles in said newspapers was paid for by the Kansans for the Right to Work, and was signed with its corporate name; and, defendant published the libelous matter herein complained of with the knowledge it was false.

"VI.

"In addition to the word 'Blackmail' which appeared in the title of both articles, in bold blackface type, the letter 'B' in the word 'Blackmail' being approximately ¾ inch in height, the word 'blackmail' also appeared in the first paragraph of the body of the article reading:

" 'At least six large trucking firms in Wichita are being picketed, yet there is no strike, no contract negotiations, no nothing—except blackmail.'

"Plaintiff denies engaging or intending to engage in said blackmail.

"VII.

"By the language appearing in these two said articles defendant has accused plaintiff and its agent or officer of intentionally committing the act of blackmail. Blackmail is a crime and felony in Kansas under G. S. Kansas, 1949, as amended, 21-2412.

"VIII.

"Defendant's published statement occurring in the articles reading:

" 'We don't care about what your employees think or want. They will join our union or they won't work for you . . .'

is not a true statement and not a correct interpretation of the language appearing in the said reproduced letter from Mr. S. E. Smith; and, by so interpreting plaintiff's letter the defendant is accusing plaintiff of violating Article 15, Section 12 of the Kansas Constitution, G. S. Kansas, 1949, as amended, 44-809 (4) and the National Labor Relations Act, as amended, Section 7 and Section 8(b).

"IX.

"Defendant's published statement appearing in the articles reading:

" 'We don't care, either, for the supposed constitutional or moral rights of your employees. They lost their rights when the lawmakers and the courts ceased to protect them and delivered their economic destiny into our hands . . .'

is not a true statement and not a correct interpretation of the language of the said reproduced letter from Mr. S. E. Smith and such statement accuses the plaintiff of violating laws including the G. S. Kansas, 1949, as amended, 44-801 through 44-817, the Constitution of the State of Kansas, especially Article 15, Section 12, and the National Labor Relations Act, as amended, especially Sections 7 and 8.

"x.

"The said reproduced letter from Mr. S. E. Smith addressed to the several trucking firms, appearing in defendant's article, was signed by S. E. Smith in his official capacity as President and Business Representative of plaintiff and S. E. Smith had the authority to send such a letter and the contents thereof have been ratified by plaintiff.

"xi.

"Plaintiff denies that it was engaged in 'blackmail picketing' as alleged by the defendant in the last two lines of the language of the said articles. Plaintiff denies that it is making use of a 'gangster gun' as alleged in the last line of the language of the articles. Use by the defendant of the language 'blackmail picketing' and 'gangster gun' in reference to the plaintiff has degraded and injured the plaintiff in the eyes of its members, friends, employers and employees with whom it deals, other employees, and the general public.

"xii.

"Defendant willfully, wantonly, recklessly, and maliciously published the said articles, attached hereto as Exhibits 'A' and 'B,' for the purpose of defaming and degrading the plaintiff. As a result of said publication plaintiff has been provoked to wrath and exposed to public contempt, ridicule, hatred, scorn and shame, and has suffered the loss of confidence with some of its members, friends, the employers and employees with whom it must deal, as well as the loss of confidence of the general public, its organizational attempts of employees have failed."

Thereupon followed the *ad damnum* clause and count two of the petition which alleged that the defendant's acts were malicious and prayed for exemplary damages.

The appellee in its brief concedes the demurrer should be sustained if there is no libel *per se* to be found in the foregoing publication. It concedes no facts have been pleaded supporting innuendo, malice or special damages, and that it had no intention to plead libel *per quod*.

The distinction between libel *per se* and libel *per quod* has long been before this court and was summarized recently in the case of *Karrigan v. Valentine*, 184 Kan. 783, 339 P. 2d 52, as follows:

"Words libelous *per se* are words which are defamatory in themselves and which intrinsically, by their very use, without innuendo and the aid of extrinsic proof, import injury and damage to the person concerning whom they were written. They are words from which, by the consent of mankind generally, damage follows as a natural consequence and from which malice is implied and damage is conclusively presumed to result. . . .

"Words libelous *per quod,* on the other hand, are words ordinarily not defamatory but which become actionable only when special damages are shown, that is, they are words the injurious character of which appears only in consequence of extrinsic facts. Thus, words not defamatory *per se,* may become actionable *per quod,* depending upon the facts and circumstances of the particular case, and this gives rise to the rule that in order to recover for a libel *per quod* special damage and injury must be alleged and proved. . . ." (p. 787.)

In the summation of its brief the appellee says: "Appellee believes appellant's advertisement accused appellee of engaging in blackmail (a crime in Kansas), of lacking good morals and failing to respect the moral rights of others, of coercing employees contrary to state and federal laws, of engaging in 'blackmail picketing', of making use of a 'gangster's gun', and of violating other laws, all of which tends to make appellee contemptible, infamous, odious and ridiculous. As such it is libel per se. . . ."

The words and phrases complained of are "blackmail," "blackmail picketing," "gangster gun," "We don't care about what your employees think or want. They will join our union or they won't work for you," and "We don't care, either, for the supposed constitutional or moral rights of your employees. They lost their rights when the lawmakers and the courts ceased to protect them and delivered their economic destiny into our hands." These, of course, must be studied in context.

*Bennett v. Seimiller,* 175 Kan. 764, 267 P. 2d 926, was a libel case involving a labor union and its use of the word "traitor" as applied to one of its members. In the course of the opinion it was said:

". . . In connection with the court's duty it generally is held that in determining whether a writing or utterance is defamatory *per se* each part thereof must be considered in its relation to the others rather than separately. In other words, the entire statement must be fairly and reasonably construed as a whole. . . . Closely related to and actually a part of the foregoing principle of interpretation is the rule that words or phrases must not be taken out of context. The rule has its roots in justice. Words, which standing alone, would be actionable may not be so when taken in connection with their context. . . ." (pp. 767, 768.)

It may be observed at the time this publication occurred in August, 1959, there was a period of unrest in the labor field. The Labor-Management Reporting and Disclosure Act of 1959 had not yet become law. The United States Supreme Court had announced the now famous "no-man's land" in which it stated that in certain labor cases the state courts could not act, the United States Supreme Court

would not act, and the Congress had not acted, thereby creating a vacuum in which certain aggrieved employees and employers were virtually without courts or remedy where the total amount of business done in interstate commerce did not meet the arbitrary minimum jurisdictional standard established by the National Labor Relations Board. (*Guss v. Utah Labor Board*, 353 U. S. 1, 1 L. Ed. 2d 601, 77 S. Ct. 598; *Meat Cutters v. Fairlawn Meats*, 353 U. S. 20, 1 L. Ed. 2d 613, 77 S. Ct. 604, reh. den. 353 U. S. 948, 1 L. Ed. 2d 857, 77 S. Ct. 822; *San Diego Unions v. Garmon*, 353 U. S. 26, 1 L. Ed. 2d 618, 77 S. Ct. 607, reh. den. 353 U. S. 951, 1 L. Ed. 2d 860, 77 S. Ct. 858; and see, *Friesen v. General Team & Truck Drivers Local Union No. 54*, 181 Kan. 769, 317 P. 2d 366; and *Newell v. Local Union 795*, 181 Kan. 898, 317 P. 2d 817, reversed *per curiam* on certiorari, 356 U. S. 341, 2 L. Ed. 2d 809, 78 S. Ct. 779.)

The term "blackmail picketing" was an infant term just coming into usage and not fully developed at the time of the publication herein. Dictionary definitions of the term were not available. To organized labor this third party type of peaceful picketing was an effective useful weapon, allegedly within the law. To the right to work group it posed a dangerous threat and the term "blackmail picketing" was catching hold to describe it. (See the discussion in *Newell v. Local Union 795*, supra, beginning at page 909.) The term "blackmail" as used in the article published, when read in context with the whole publication, was clearly a part of the new term "blackmail picketing."

The term "gangster gun" when read in context is clearly a figure of speech with a significance entirely distinct from the true meaning of the term if used in isolation. Citizens were urged to act at once "to force a halt to *this type of blackkmail picketing which is being used as a gangster gun* in the ribs of business and its employees." (Emphasis added.) Obviously, the picketing described is not a *gun* and a business does not have *ribs*. The terms employed to describe how such picketing was being used were thus figures of speech having an entirely different connotation than the true meaning of the words when isolated and defined. In this connection see the fourth paragraph of the appellant's comments under "what the union boss is saying."

Of vital significance to this appeal is Paragraph X. of the petition. By this paragraph the appellee admits the Smith letter was addressed to the trucking firms in question and signed by Smith in

his official capacity as president and business representative of the appellee. It further admits Smith had authority to send such letter and that the contents thereof have been ratified by the appellee. Furthermore, the petition does not complain of the charge made in the article that pickets were placed at these various trucking firms, nor does the petition deny the truth of these charges. Instead, the complaint is that the appellee's organizational attempts failed.

With these admissions the court must look to the entire publication and determine, as a matter of law, whether any statement therein contained is reasonably susceptible of constituting libel *per se*. (*Bennett v. Seimiller,* supra.)

It is unnecessary to review the development of labor law under the Labor Management Relations Act, 1947, commonly known as the Taft-Hartley Act, to dispose of this appeal. This law may be found in the decisions of the United States Supreme Court heretofore cited in this opinion and in those cited in *Newell v. Local Union 795,* supra, and *Higgins v. Cardinal Manufacturing Co.,* 188 Kan. 11, 360 P. 2d 456, certiorari denied 368 U. S. 829, 7 L. Ed. 2d 32, 82 S. Ct. 51. Our state law is found in *Higgins* and other recent labor decisions of this court cited therein.

Charges of falsity and denials made by the allegations of the appellee's petition itself are insufficient to overcome the *overriding effect of the admissions* made therein regarding the activity of the appellee through its president and business representative, S. E. Smith, as disclosed by his letter to the trucking firms and his admitted activity thereafter for which the appellee is responsible.

While the terms "blackmail" and "blackmailer," when used against a person to mean that such person committed the offense of extortion, have been held sufficient to sustain an action for libel *per se* in *Hess v. Sparks,* 44 Kan. 465, 24 Pac. 979, the circumstances here presented are different and we have a different type of publication. Here the publication itself clearly defines the meaning of the term "blackmail picketing" which the reader may readily grasp by reading both the letter and the comments thereon.

Whether the Teamsters care or do not care what the employees of the trucking firms think or want, or for their supposed constitutional or moral rights (See Paragraphs VIII and IX of the petition) is not a crime under either state or federal law. These comments are not reasonably susceptible of constituting libel *per se*.

Expressions in other cases which were held not to be actionable

*per se* are: "All I want you to do is to pay your honest debts," (*Hamilton v. McKenna,* 95 Kan. 207, 211, 147 Pac. 1126); that an attorney "refused to answer the court's questions as to what he had done with the money which he had collected for the estate, which he had not turned over to the proper parties," (*Hanson v. Bristow,* 87 Kan. 72, Syl. ¶ 2, 123 Pac. 725); "the mayor of a city said, . . . that he was running the town, and the council and people had nothing to do about it," (*Dever v. Montgomery,* 89 Kan. 637, Syl., 132 Pac. 183).

Upon all the facts, conditions and circumstances presented by this appeal we are of the opinion that the comments made by the appellant in the publication readily fall within the category of fair editorial comment, and as such are protected by the constitutional guarantee of free speech.

Having concluded that no cause of action is stated constituting libel *per se* in count one of the petition, the second count seeking exemplary damages must necessarily fail. (See, *Branstetter v. Robbins,* 178 Kan. 8, 14, 283 P. 2d 455.)

In conclusion we hold the lower court erred in overruling the appellant's demurrer to the petition. The judgment is reversed.