(645 P.2d 916)
No. 53,111

SILVINO GOMEZ, *Appellant,* v. ROLAND HUG and BOARD OF COUNTY COMMISSIONERS OF SHAWNEE COUNTY, KANSAS, *Appellees.*

Petition for review denied September 17, 1982.

Opinion filed June 3, 1982.

*Pedro Luis Irigonegaray* and *Pantaleon Florez, Jr.,* of Hawver & Irigonegaray, P.A., of Topeka, for appellant.

*Terry E. Beck,* of Tilton, Dillon, Beck & Crockett, of Topeka, for appellee Roland Hug.

*Donna Voth,* assistant county counselor, for appellee Board of County Commissioners.

Before REES, P.J., MEYER, J., and RICHARD W. WAHL, District Judge assigned.

WAHL, J.: In keeping with the duties of a court in ruling on a motion for summary judgment, the "facts" as stated herein are gleaned from the record and are those "facts" viewed in the light most favorable to the plaintiff. They are not a recitation of facts found by the trier of facts from an evidentiary hearing, nor are they a statement of "facts" as this Court believes they should be found by the trier of facts at an evidentiary hearing.

On April 21, 1978, Silvino Gomez was employed as a supervisor at the Shawnee County fairgrounds. His immediate supervisor was the fairgrounds administrator, Robert Kanatzer. During the evening hours of April 21, 1978, Gomez and Kanatzer were engaged in preparing an area of the fairgrounds for a horse show. They learned of a water line break and, after determining the

problem, proceeded to the administrator's office to phone a piping contractor.

Appellee Roland Hug, a member of the Board of County Commissioners of Shawnee County, and a companion, Robert Corbett, were in Kanatzer's office when Gomez and Kanatzer arrived. As they entered the office, Hug asked Kanatzer, "What is that fucking spic doing in the office?" Hug then repeated the question, again referring to Gomez as a "fucking spic." Hug then ordered Gomez over to where he was, again referring to Gomez as a "fucking spic." Gomez complied with Hug's order to approach him and inquired of Hug as to what he meant by that name. Gomez testified in his deposition that the following exchange took place between him and Hug:

"A.  .  .  .  'Commissioner, you have repeatedly stated that remark throughout the day and in the past day or two. Can you give me your interpretation of a fucking spic?' He said, 'You are a fucking spic.' I said, 'What does it mean?' He said, 'A fucking Mexican greaser like you, that is all you are. You are nothing but a fucking Mexican greaser, nothing but a pile of shit.' And he repeated it over and over and he raised his fist and he said, 'Now what are you going to do about it?' He got that close to me (indicating) and said, 'What are you going to do about it?' He kept hollering it out and hollering it out. He said, 'Go ahead and do something about it, you fucking Mexican greaser. I have told you what you are. You are nothing but a fucking spic.' And he repeated it over and he kept shaking his fists in front of my eyes and pounding on the desk and he would come up to me and say, 'Are you going to do something, you coward, you greaser, you fucking spic? What are you going to do? Don't stand there like a damn fool because that is all you are is a pile of shit.'

"Q. [by Mr. Beck] These are the exact words that you are using? Are these all exact quotes of Mr. Hug that you are giving us here right now?

"A. Yes. He repeated it over and over.

"Q. You stated he was pounding the desk with his fist?

"A. Pardon?

"Q. Did you say he was pounding the desk with his fist?

"A. He caught me offguard when he said that to me because I didn't expect that to come from a Commissioner. In fact, I didn't expect it to come from anyone. But we are speaking about Roland Hug. He kept threatening me. What was I going to do about it? He kept putting his fist in front of my face and pounding on that table, 'What are you going to do about it?' and repeating it over and over that I was nothing but a fucking spic. 'Now, you said you know what the definition of a spic is. You are nothing but a fucking spic and a Mexican greaser,' and he kept repeating it over and over, and he kept shaking his fist in front of me. I was froze because I was afraid of the man. For the first time in my life, I was terrified of one man calling me that. I was afraid for my job. I was afraid for my family."

It is variously estimated that this tirade lasted from five to fifteen minutes. After the exchange between Gomez and Hug, Kanatzer escorted Gomez out of the office and took him home. Gomez appeared to be upset.

Gomez began having serious medical problems. He sought medical advice and treatment from Dr. D. J. Weber, his family physician, Dr. Vinod Patel, a neurologist, and Dr. James N. Nelson, a psychiatrist. Both Dr. Nelson and Dr. Patel stated in their reports that Gomez' medical problems were related to the complained-of incident. Gomez was hospitalized from July 5, 1978, through July 18, 1978. He was unable to work due to his health-related problems and finally resigned his job with the county in November, 1979.

Appellees moved for summary judgment and the motion was sustained and judgment entered for the appellees. Gomez appealed.

K.S.A. 60-256(c) provides that a motion for summary judgment may be sustained only if the record before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

In *Farmers Ins. Co. v. Schiller,* 226 Kan. 155, 158, 597 P.2d 238 (1979), the Supreme Court held:

"Summary judgment may be granted when the record before the court shows conclusively there remains no genuine issue as to any material fact after the party against whom the motion was filed has failed to controvert a showing by affidavit, deposition, or otherwise that the moving party is entitled to judgment."

In ruling on a motion for summary judgment, the district court must view the record in the light most favorable to the party against whom the motion is filed.

"In considering a motion for summary judgment a trial court must give to a litigant against whom judgment is sought the benefit of all inferences that may be drawn from the admitted facts under consideration. (*Timi v. Prescott State Bank,* 220 Kan. 377, Syl. ¶ 2, 553 P.2d 315 [1976].) A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties. (*Henrickson v. Drotts,* 219 Kan. 435, 438, 548 P.2d 465 [1976].)" *Bowen v. Westerhaus,* 224 Kan. 42, 45, 578 P.2d 1102 (1978).

Another test for the trial court was stated in *Pedi Bares, Inc. v. First National Bank,* 223 Kan. 477, Syl. ¶ 2, 575 P.2d 507 (1978):

"It is only when it can be said that reasonable persons could reach but one conclusion from the same evidence that an issue may be decided as one of law. Summary judgment should never be granted merely because the court may believe movant will prevail if the action is tried on the merits."

If there is a reasonable doubt as to existence of a material fact, a motion for summary judgment will not lie. *Welch v. Young,* 225 Kan. 189, 589 P.2d 567 (1979); *Secrist v. Turley,* 196 Kan. 572, 575, 412 P.2d 976 (1966).

*Did the district court err in determining, as a matter of law, that no assault occurred?*

An assault is defined in PIK Civ. 2d 14.01 (1977) as follows:

"An assault is an intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm. No bodily contact is necessary."

Words alone will not constitute an assault, as stated in Restatement (Second) of Torts § 31 (1965):

"Words do not make the actor liable for assault unless together with other acts or circumstances they put the other in reasonable apprehension of imminent harmful or offensive contact with his person."

Gomez' testimony contained the following statements:

"And he repeated it over and over and he raised his fist and he said, 'Now what are you going to do about it?'"

"He got that close to me (indicating) and said, 'What are you going to do about it?'"

"And he repeated it over and he kept shaking his fists in front of my eyes and pounding on the desk."

"He kept threatening me. What was I going to do about it? He kept putting his fist in front of my face and pounding on that table."

"[H]e kept repeating it over and over, and he kept shaking his fist in front of me. I was froze because I was afraid of the man."

Viewing the record in a light most favorable to Gomez, and giving him the benefit of all inferences that may be drawn from the record, this Court cannot say that reasonable persons could reach but one conclusion from this evidence. When the other acts and circumstances are considered—that Gomez and Hug had previously had problems which resulted in litigation; that Hug was Gomez' employer; that Hug was obviously very angry; that the fist-shaking, pounding of the table and the shouting of invectives lasted from five to fifteen minutes—this Court cannot say, as a matter of law, that Gomez could not have been in immediate apprehension of bodily harm.

In viewing the totality of the situation, this Court believes that the trial court erred in granting summary judgment on the issue of whether Hug assaulted Gomez. It is a question to be determined by a jury.

*Did the district court err in determining, as a matter of law, that Gomez had no cause of action for intentional infliction of emotional distress by Hug?*

The Kansas Supreme Court considered a comparable wrong in *Whitsel v. Watts,* 98 Kan. 508, 159 Pac. 401 (1916). There, the plaintiff suffered a miscarriage after being frightened when the defendant jumped from his buggy, ran towards the plaintiff in an angry, threatening manner, swearing, shaking his fist and saying, "You are fooling with the wrong person this time." The Court, speaking through Chief Justice Johnston, held:

"Defendant insists that he inflicted no bodily injury upon her, that no physical injury was in fact threatened, that there was no assault upon her and that proof of a mere fright furnishes no basis for a recovery. It has long been the rule here that there can be no recovery for fright or mental anguish unless it results in or is accompanied by physical injury to the person. (*Shelton v. Bornt,* 77 Kan. 1, 93 Pac. 341.) The plaintiff, however, is not asking a recovery for fright alone, but for the personal injuries directly resulting from fright caused by the willful tort of the defendant. It is argued that as the acts of the defendant did not amount to an assault she has no right to recover; but the defendant's liability does not depend upon whether his wrongful onset constituted an assault. The plaintiff is seeking to enforce a civil liability for the consequences of the wrong and the general rule is that a wrongdoer is liable in damages for injuries which are the natural and reasonable consequences of his wrongful act, whatever name may be fittingly applied to the wrong." 98 Kan. at 509.

In *Dawson v. Associates Financial Services Co.,* 215 Kan. 814, 529 P.2d 104 (1974), the plaintiff, a former employee of Associates, was delinquent on a car loan from Associates due to having lost her job when she developed multiple sclerosis. She received four phone calls from Associates about the account similar in content to calls she had had to make to delinquent debtors when she worked there. She referred them to her insurance carrier on the first call. On the second call Associates threatened to repossess the car, sell it and hold her responsible for any deficiency. On the third call plaintiff was told when the car would be repossessed, that it would ruin her credit rating, and would somehow involve her parents' business. On the fourth call, plaintiff got emotional and told Associates to call her attorney. After receiving

these calls, plaintiff suffered physical distress and had to go under a doctor's care.

In *Dawson,* the Court adopted the rule from Restatement (Second) of Torts § 46 (1) (1965), which provides:

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

The Court further held:

"[T]hat it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so, and where reasonable men may differ, the question is for the jury to determine." 215 Kan. at 824.

In *Dawson,* the trial court excluded evidence of telephone calls by Associates to plaintiff's parents about the delinquency of plaintiff's loan as being irrelevant. The Supreme Court held the evidence should have been admitted, stating:

"Whether the excluded evidence would bolster the appellant's case to show that Associates by extreme and outrageous conduct intentionally or recklessly caused severe emotional stress to the appellant, thereby establishing a *prima facie* case, cannot be readily ascertained from the record. Certainly the excluded testimony was relevant to the issue being tried." 215 Kan. at 823.

The Supreme Court, speaking through now Chief Justice Schroeder, concluded:

"Certainly creditors must be permitted to pursue reasonable methods of collecting debts, and debtors are protected only from extreme and outrageous conduct. Nonetheless, methods of collecting debts which might be reasonable in some circumstances, might also be regarded as outrageous in others where it is known that the debtor is particularly susceptible to emotional distress due to a disease such as multiple sclerosis. Here the appellant made claim for payments on an insurance policy which Associates had sold her.

"While only the substance of the evidence excluded by the trial court was proffered, the proffer discloses Associates said to the appellant's mother 'they were going to ruin [appellant's] credit'; and that when the calls from Associates became more threatening the appellant's mother talked to the appellant about them. When the details of the evidence excluded are presented in open court, the appellant's evidence may be sufficiently strengthened to make a submissible case for the jury." 215 Kan. at 825.

*Dotson v. McLaughlin,* 216 Kan. 201, 531 P.2d 1 (1975), was an action for invasion of privacy, but the Court also considered the matter of outrageous conduct. The Court, at page 210, quoted comment *d* from § 46 of Restatement (Second) of Torts:

" 'The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. . . . Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim "outrageous!"

" 'The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam. . . .' (p. 73.)"

No abusive language was employed. The mere fact of frequent phone calls from Dotson to McLaughlin to state that SBA loans would be foreclosed if McLaughlin did not cooperate was not sufficiently extreme or outrageous to give rise to liability.

*Bradshaw v. Swagerty,* 1 Kan. App. 2d 213, 563 P.2d 511 (1977), was an action for slander and outrage. The epithets in question were "nigger," "bastard" and possibly "knot-headed boy." Plaintiff's legitimacy was conceded. The trial court granted summary judgment to the defendant on both counts. The appellate court agreed that these words were " 'mere insults' of the kind which must be tolerated in our rough-edged society." 1 Kan. App. 2d at 216.

In *Wiehe v. Kukal,* 225 Kan. 478, 592 P.2d 860 (1979), Mrs. Kukal was seeking damages for emotional distress sustained by her when she witnessed a fence line dispute during which Wiehe assaulted her husband with a pitchfork but never touched him. Wiehe waved the fork over his head toward Kukal in a threatening manner, raved and shouted at Kukal, calling him names and claiming Kukal was stealing his land. The Supreme Court ruled that Wiehe's conduct was not extreme and outrageous and that Wiehe did not intentionally or recklessly cause Mrs. Kukal's severe emotional distress.

In the instant case the appellees rely heavily on *Bradshaw v. Swagerty,* 1 Kan. App. 2d 213, and *Dotson v. McLaughlin,* 216 Kan. 201. The reliance is misplaced. The cases are distinguishable. In *Bradshaw,* the plaintiff was in an attorney's office con-

cerning a collection letter. During the interview he was called a "nigger," a "bastard" and possibly a "knot-headed boy." However tasteless such outbursts are, they do not sink to the abysmal degradation of the words used by Hug. They did not wield a similar emotional impact upon their target.

In *Dotson,* the facts are so dissimilar that it is of no help. McLaughlin was simply complaining of the frequency of Dotson's calls while trying to collect a note.

The relative positions of Gomez and Hug are important here. Hug was the employer. Gomez was the employee. Hug spoke from the position of a county commissioner. These remarks had been made to Gomez by Hug over a period of several days. The tirade unleashed upon Gomez on April 21, 1978, was terrifying to him. He was afraid of Hug, afraid for his job, afraid for his family. Each party argues a different meaning from these statements of Gomez' fear. It is an issue for the trier of fact.

*Contreras v. Crown Zellerbach,* 88 Wash. 2d 735, 565 P.2d 1173 (1977), concerned the allegations of a Mexican-American that he had been the object of racial insults, humiliation and embarrassment during the course of his employment. The Washington Court found that liability for infliction of mental distress could attach under the facts alleged. The Court held at p. 741:

"When one in a position of authority, actual or apparent, over another has allegedly made racial slurs and jokes and comments, this abusive conduct gives added impetus to the claim of outrageous behavior. Restatement (Second) of Torts § 46 comment *e.* The relationship between the parties is a significant factor in determining whether liability should be imposed."

We can agree with the comment from Restatement of Torts quoted above. We cannot agree that it was for the trial court to rule that what was said to Gomez was a mere insult, a petty oppression or other triviality. This was a matter for the jury. Certainly there is no occasion for the law to intervene in every case where someone's feelings are hurt. Certainly the rough edges of our society still need smoothing down and there must still be freedom to blow off harmless steam. But this vituperation was well beyond the bounds of freedom to blow off harmless steam. It is not a burden of American citizenship in the State of Kansas that such vitriolic bullying as was turned by Hug against Gomez, and its emotional and physical consequences, must be accepted without possibility of redress and accepted as often as it amuses

the speaker to utter it. Kansas courts are not so impotent. At the very least the victim of such an attack has the right to have his grievance heard by a jury of average members of the community to know whether they would exclaim, "Outrageous!"

It cannot be said that reasonable persons could reach but one conclusion from the evidence in this case. The trial court erred in sustaining the motion for summary judgment as to the allegation of intentional infliction of emotional distress by the defendant Hug.

*Did the district court err in determining as a matter of law that Gomez had no cause of action for defamation?*

Prosser, Law of Torts (4th ed. 1971) at 737, states:

"In either form, defamation is an invasion of the interest in reputation and good name. This is a 'relational' interest since it involves the opinion which others in the community may have, or tend to have, of the plaintiff. Consequently defamation requires that something be communicated to a third person that may affect that opinion. . . . Defamation is not concerned with the plaintiff's own humiliation, wrath or sorrow, except as an element of 'parasitic' damages. . . ."

In the same work by Prosser, at page 739, it is written that defamation is an act which "tends to injure 'reputation' in the popular sense; to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held, or to excite adverse, derogatory or unpleasant feelings or opinion against him."

Defamation includes both libel and slander. In *Henderson v. Ripperger,* 3 Kan. App. 2d 303, 306, 594 P.2d 251 (1979), the Court held:

"There are two types of slander, slander per se and slander per quod. In that slander is oral libel, what is said in *Karrigan v. Valentine,* 184 Kan. 783, 787, 339 P.2d 52 (1959), is pertinent:

" 'Words libelous *per se* are words which are defamatory in themselves and which intrinsically, by their very use, without innuendo and the aid of extrinsic proof, import injury and damage to the person concerning whom they were written. They are words from which, by the consent of mankind generally, damage follows as a natural consequence and from which malice is implied and damage is conclusively presumed to result. Where libel *per se* is claimed the question presented is whether the words on their face, without explanation or extrinsic proof, would necessarily, or as a natural and immediate consequence cause injury and whether a newspaper article is libelous *per se* is a question of law for the court to determine. (*Jerald v. Houston,* 124 Kan. 657, 261 Pac. 851; *Bennett v. Seimiller,* 175 Kan. 764, 267 P.2d 926; *Koerner v. Lawler,* 180 Kan. 318, 304 P.2d 926; 33 Am. Jur., Libel and Slander, § 5, p. 39, *et seq.,* and 53 C.J.S., Libel and Slander, § 8, p. 41, *et seq.*)

" 'Words libelous *per quod,* on the other hand, are words ordinarily not defamatory but which become actionable only when special damages are shown, that is, they are words the injurious character of which appears only in consequence of extrinsic facts. Thus, words not defamatory *per se,* may become actionable *per quod,* depending upon the facts and circumstances of the particular case, and this gives rise to the rule that in order to recover for a libel *per quod* special damage and injury must be alleged and proved. (See authorities above cited.)' "

In *Kraisinger v. Liggett,* 3 Kan. App. 2d 235, 236-237, 592 P.2d 477, *rev. denied* 226 Kan. 792 (1979), the Court ruled:

"The law in Kansas is well established that the determination of whether a statement is libelous or slanderous per se is a question of law for the trial court to determine. *Local Union No. 795 v. Kansans for the Right to Work,* 189 Kan. 115, 368 P.2d 308 (1962). In order to receive such treatment, a defamatory statement must fall into one of four categories, namely: (1) Imputation of a crime; (2) imputation of a loathsome disease (usually venereal); (3) imputation of a person's unfitness for his trade or profession; or (4) imputation that a woman is unchaste."

Hug's words, however objectionable, do not constitute slander per se. To recover for slander per quod, Gomez must allege and prove special damages.

"The special damage [which constitutes the basis of recovery when the defamation is actionable per quod] must be of a material and, generally, of a pecuniary nature. It must result from the conduct of a person other than the defamer or the defamed, and the conduct must be directly caused by the publication of the slander." *Urban v. Hartford Gas Co.,* 139 Conn. 301, 308, 93 A.2d 292 (1952).

Gomez' alleged injuries are personal injuries resulting from Hug's actions. The record reveals no evidence of injury to Gomez' reputation or good name—the "relational" interest involved in the tort of defamation. There is no evidence of damages to Gomez from third persons resulting from the alleged defamation. Without such evidence there can be no recovery based upon defamation and therefore summary judgment for defendants was proper on this issue.

*Did the district court err in granting judgment for the defendants based upon Gomez' claim under 42 U.S.C. § 1983?*

Gomez alleges that he "was denied his civil rights in violation of 42 U.S.C. § 1983 by the Defendant acting under color of law." The statute, 42 U.S.C. § 1983, provides:

"Civil action for deprivation of rights.

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the

deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress."

The purpose of this statute was to provide redress for the deprivation of federally protected civil rights when such was done under color of law. *Kerr v. United States Dist. Ct. for North. Dist. of Cal.,* 511 F.2d 192 (9th Cir. 1975), *aff'd* 426 U.S. 394 (1976).

Verbal harassment or abuse is insufficient to support a § 1983 action, as in defamation. *Collins v. Cundy,* 603 F.2d 825 (10th Cir. 1979); *Paul v. Davis,* 424 U.S. 693, 47 L.Ed.2d 405, 96 S.Ct. 1155 (1976). This is true even where the defamation is malicious and committed by a state official. *Taylor v. Nichols,* 409 F. Supp. 927 (D. Kan. 1976), *aff'd* 558 F.2d 561 (10th Cir. 1977).

Gomez also claims that Hug's actions were intended to and did coerce Gomez into leaving his job and that such actions constitute an unfair labor practice under 42 U.S.C. § 2000e and that such actions have deprived Gomez of a property right without due process. It is apparent from the record that this claim was not presented to the trial court. It is well settled in this state that a point not raised before the trial court cannot be raised for the first time on appeal. *Fleming v. Etherington,* 227 Kan. 795, 610 P.2d 592 (1980).

Regarding Gomez' claim that he was deprived of a property right, there is no evidence in the record that plaintiff had a reasonable expectation of continued employment sufficient to give rise to a property right. Furthermore, there is no evidence in the record that Gomez was coerced into leaving his job by this occurrence. The record indicates that Gomez left his job some nineteen months after the occurrence.

The trial court did not err in granting summary judgment on this allegation.

*Did the district court err in granting summary judgment for the Board of County Commissioners of Shawnee County?*

The district court held that the Board of County Commissioners was not liable for the acts of Hug under the theory of respondeat superior. The key element for the application of respondeat superior is the principal's or master's right to direct and control the activities of the agent or servant. *Brown v. Wichita State University,* 217 Kan. 279, 540 P.2d 66 (1975), *modified* 219 Kan. 2, 547 P.2d 1015 (1976).

Pursuant to K.S.A. 19-202, county commissioners are elected officials who hold office for a term of four years. Their powers are enumerated by K.S.A. 19-212 and they have only such powers as are conferred upon them by statute. *Cunningham v. Blythe,* 155 Kan. 689, 127 P.2d 489 (1942).

Whether a municipal corporation may be held liable for the wrongful acts of public officers depends on whether the officer occupies the status of agent or servant of the municipality. The criteria for determining the status of an elected officer is set out in 57 Am. Jur. 2d, Municipal, Etc., Tort Liability § 85, p. 95:

"If, on the other hand, they are elected or appointed by the corporation in obedience to the statute, to perform a public service not peculiarly local or corporate, but because this mode of selection has been deemed expedient by the legislature in the distribution of powers of the government; if they are independent of the corporation as to the tenure of their office and the manner of discharging their duties, they are not to be regarded as the servants or agents of the corporation, for whose acts or negligence it is impliedly liable, but as public or state officers with such powers and duties as the statute confers upon them, and the doctrine of respondeat superior is not applicable."

Because the duties of a county commissioner in this state are fixed by statute, the county, acting through its commissioners, cannot control or direct the actions of the individual commissioners. They are neither agents nor servants of each other. They act independently to perform the duties conferred upon them by law. Absent the relationship of principal and agent, the doctrine of respondeat superior cannot apply.

The Kansas Supreme Court has recognized this general rule in a case involving the failure of city officials to enforce a city ordinance. In *Everly v. City of Gas,* 95 Kan. 305, 307, 147 Pac. 1134 (1915), the Court held:

"Although elected or appointed by the city, paid by the city, and subject to discharge by the city, its officers are public officials and not agents of the corporation for whose neglect or misconduct the city can be held responsible in a civil action according to the doctrine of *respondeat superior.*"

The acts of the defendant, Hug, were personal to him. He was exceeding all statutory authority granted to him. His acts were not the acts of Shawnee County.

The trial court properly entered judgment for the defendant Board of County Commissioners.

The judgment of the trial court is affirmed in part and reversed

in part and remanded for further proceedings in conformity herewith as to the defendant Roland Hug.

REES, J.: Concurring.

Plaintiff brought this action asserting four alternative causes of action—assault, slander, outrage and denial of constitutional rights by a person acting under color of law (42 U.S.C. § 1983). He appeals from an adverse order of summary judgment entered after completion of discovery. The majority concludes plaintiff has a submissible case against defendant Hug for assault and outrage but not for slander or denial of constitutional rights under 42 U.S.C. § 1983. They also conclude plaintiff has no submissible claim against the Shawnee County Board of County Commissioners. I agree with their result. However, I look at this case and record somewhat differently and I cannot join in their approach to and treatment of certain matters.

I am concerned first that the presentation of the facts in this case be properly read and understood. Although the first paragraph of the majority opinion acknowledges the facts are to be viewed in the light most favorable to the plaintiff and professes to do so, the factual statement becomes an exposition of the plaintiff's case. Few material facts are demonstrated in the discovery record without contradiction. What the facts are has not been decided, and it is not our lot to do so. The question before us is not whether plaintiff should recover in this action; it simply is whether the discovery record, when viewed most favorably to plaintiff, contains evidence which if true is sufficient to support findings of fact that in turn would support a judgment for recovery by plaintiff. The question before us is one of law.

I agree with remand of the assault question, but would elaborate on the reasoning. By one of its pattern instructions, the Committee on Pattern Jury Instructions, the Kansas Judicial Council, suggests assault be defined as "an intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm," and adds "[n]o bodily contact is necessary." PIK Civ. 2d 14.01 (1977). This is the statutory definition of the criminal offense of assault (K.S.A. 21-3408) rephrased. The definition is not disputed by the parties. The pivotal issues before us are whether the discovery record includes sufficient evidence to submit to a jury the question whether Hug *intended* to threaten or attempt to do

bodily harm to plaintiff and whether plaintiff was in immediate apprehension of bodily harm.

The trial judge found there was insufficient evidence Hug "intended to inflict bodily harm." This misses the mark on the first issue. Assuming apparent ability to do bodily harm, assault does not require that the actor intend bodily harm; it is sufficient if the actor intends to threaten to do bodily harm.

Hug's intent may be deduced by a jury from his words and conduct. Circumstances attending the act of a party are competent evidence of the state of his mind in doing it. *Eckerd v. Weve,* 85 Kan. 752, 758, 118 Pac. 870 (1911). Intent may be shown by acts, circumstances and inferences deducible therefrom. *State v. Smith,* 4 Kan. App. 2d 149, 150, 603 P.2d 638 (1979).

Plaintiff's testimonial description of Hug's words and conduct speaks for itself. That testimony, if found true, is sufficient to raise the fact question whether Hug intentionally threatened bodily harm to plaintiff. While words alone do not constitute assault, there is an assault if words together with other acts or circumstances put one in reasonable immediate apprehension of bodily harm. Restatement (Second) of Torts § 31 (1965); PIK Civ. 2d 14.01 (1977).

The trial judge also found the discovery record failed to show plaintiff apprehended bodily harm. He found that what plaintiff suffered was concern for his job and the impact its loss would have on his family. The particular portion of the discovery record going to this issue is the following deposition testimony of plaintiff's:

" 'You are nothing but a fucking spic and a Mexican greaser,' and he kept repeating it over and over, and he kept shaking his fist in front of me. I was froze because I was afraid of the man. For the first time in my life, I was terrified of one man calling me that. I was afraid for my job. I was afraid for my family."

While it is true this testimony demonstrates plaintiff's concern for his job and the impact its loss would have on his family, we are of the opinion reasonable factfinders might differ as to whether this testimony, if found true, also establishes apprehension of bodily harm. It is a close call, but I find it is for a jury to decide upon presentation and testing of evidence at trial.

The discovery record presents a submissible claim for assault.

Aside from the rather amorphous opinion in *Whitsel v. Watts,* 98 Kan. 509, 159 Pac. 401 (1916), and possibly *Townsend v.*

*Seefeld,* 102 Kan. 302, 305, 169 Pac. 1157 (1918), our case law on the tort of outrage begins with *Dawson v. Associates Financial Services Co.,* 215 Kan. 814, 529 P.2d 104 (1974). *Roberts v. Saylor,* 230 Kan. 289, 292, 637 P.2d 1175 (1981). In *Dawson,* defendants' directed verdict was reversed. In every later reported Kansas appellate opinion addressing the tort of outrage, plaintiff was held not entitled to recovery as a matter of law. *Roberts v. Saylor,* 230 Kan. 289 (summary judgment affirmed); *Wiehe v. Kukal,* 225 Kan. 478, 592 P.2d 860 (1979) (judgment for plaintiff reversed); *Vespa v. Safety Fed. Savings & Loan Ass'n,* 219 Kan. 578, 549 P.2d 878 (1976) (summary judgment affirmed); *Dotson v. McLaughlin,* 216 Kan. 201, 531 P.2d 1 (1975) (judgment for plaintiff reversed); *Young v. Hecht,* 3 Kan. App. 2d 510, 597 P.2d 682, *rev. denied* 226 Kan. 793 (1979), (summary judgment affirmed); *Bradshaw v. Swagerty,* 1 Kan. App. 2d 213, 563 P.2d 511 (1977) (summary judgment affirmed).

*Roberts* is our present text on the tort of outrage. There it is said the cause of action is for the intentional infliction of mental distress; no bodily harm is required to support such an action. "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress." 230 Kan. at 292.

"Proof of four elements is required to establish the cause of action: (1) The conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe." 230 Kan. at 292.

According to *Roberts,* there are two determinations that must be made as matters of law before consideration is given to proof of the four elements of the cause of action. These two threshold determinations are:

"(1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." 230 Kan. at 292-293.

A common factor is reasonableness. In other words, (1) would it be *reasonable* to find the defendant's conduct so extreme and outrageous as to permit recovery; and (2) should no *reasonable* person be expected to endure emotional distress of the extremity

and severity *reasonably* and actually suffered by the plaintiff? Simply put, the plaintiffs' claims in *Roberts, Wiehe, Vespa, Dotson, Young* and *Bradshaw* did not pass muster upon threshold examinations. As *Roberts* puts it:

"If the court determines from the pleadings, stipulations, admissions, and deposition of the plaintiff that reasonable fact finders might differ as to whether defendant's conduct was sufficiently extreme and outrageous as to subject him to liability for emotional distress, and if the court further determines plaintiff's emotional distress was such that reasonable fact finders might differ as to whether plaintiff's emotional distress was genuine and so severe and extreme as to result in liability, then and only then, it must be left to the jury to determine liability based on the evidence at trial." 230 Kan. at 294.

In my view and in the obvious view of the majority, the discovery record in this case is sufficient for a reasonable jury to find defendant Hug's conduct was so extreme and outrageous as to permit recovery by the plaintiff and to find the plaintiff reasonably and actually suffered emotional distress, which under the circumstances was so extreme and severe no reasonable person should be expected to endure it.

"It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt. Freedom remains to express an unflattering opinion and to blow off relatively harmless steam which comes from an uncontrollable temper. Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." *Roberts v. Saylor,* 230 Kan. at 293.

It is in this regard that the trial judge found plaintiff's claim deficient under the discovery record. The majority and I disagree with that decision. If Hug's conduct is found by a jury to have occurred as the discovery record indicates when viewed most favorably to the plaintiff, that conduct, under the circumstances then existing, could reasonably be found to exceed mere insult, indignity, threat, annoyance, petty expression, triviality, criticism, rough language, unflattering opinion, uncontrollable blow off of relatively harmless steam, or inconsiderate and unkind acts and words members of the public are necessarily expected and required to be hardened to. This is not to say such is the case, only that there is room for a jury to so find.

With respect to the second threshold determination, *Roberts* says:

> "The second threshold requirement which must be met and which the court must first determine as present is that the plaintiff's emotional distress is sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it.
>
> "Emotional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry. However, it is only when emotional distress is extreme that possible liability arises.
>
> "The extreme distress required must be reasonable and justified under the circumstances, and there can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge. *Dawson v. Associates Financial Services Co.,* 215 Kan. at 820; Restatement (Second) of Torts § 46 (1), comment *f.* The emotional distress must in fact exist, and it must be severe. Prosser, Law of Torts (4th ed. 1971) at 59." 230 Kan. at 293-294.

The proposed medical evidence, standing alone, is sufficient to support a finding plaintiff suffered genuine and severe emotional distress as a result of the encounter. The discovery record includes evidence such that reasonable factfinders might differ as to whether such emotional distress was so extreme no reasonable person should be expected to endure it and whether it was reasonable and justified under the circumstances. In this situation, the second prong of the threshold test is satisfied.

Having met the two threshold requirements, it follows there is sufficient evidence for a jury to find proof of the second and fourth elements of the tort of outrage. However the discovery record is viewed, it cannot reasonably be denied it reveals Hug's conduct to have been intentional; there is sufficient proposed evidence to satisfy the first element of the cause of action. There obviously is sufficient proposed evidence to support a jury finding of causally related emotional distress; the third element of the cause of action can be satisfied.

It may be that at the close of plaintiff's evidence or at the close of all the evidence at trial, the evidence presented and properly admitted will be legally insufficient for jury consideration. It may be that under the trial evidence, a jury will find failure of proof of one or more elements of the tort of outrage. In either event, judgment against the plaintiff will be proper. We merely find the discovery record sufficient to allow plaintiff to attempt to prove at

trial the four elements of the tort of outrage and that judgment should not be entered against him now.

I agree with the majority's resolution of the slander question. There is nothing in the record to support a finding Hug communicated to a third party a statement falling within any of the four categories of slander per se as enunciated in *Kraisinger v. Liggett,* 3 Kan. App. 2d 235, 592 P.2d 477, *rev. denied* 226 Kan. 792 (1979). Neither is there evidence of communication to others resulting in diminution of Gomez' reputation and consequential actual damage to Gomez resulting from conduct of such third parties; thus, there is no slander per quod.

In regard to Gomez' claim that Hug's purported defamatory statements entitle him to pursue recovery under 42 U.S.C. § 1983, the only "color of law" claim urged in the trial court, the case authorities cited in the majority opinion render recovery by the plaintiff impermissible.

Lastly, summary judgment in favor of the Shawnee County Board of County Commissioners was correct. There can be no recovery under the doctrine of respondeat superior—county commissioners are not agents of the board or of each other. Further, the conduct of Hug of which complaint is made cannot be viewed other than as personal, and not an act of the county.