Penelope HUTCHINGS, Plaintiff,

v.

Kevin M. KUEBLER, M.D., P.A., Defendant.

No. 96–2487–JWL.

United States District Court, D. Kansas.

April 21, 1998.

---

Ruth M. Benien, Benien & Kaplan, Chtd., Kansas City, KS, for Plaintiff.

Chris R. Pace, Wallace, Saunders, Austin, Brown & Enochs, Chartered, Overland Park, KS, Hal D. Meltzer, Gabrielle Rhodes, Turner & Boisseau, Chartered, Overland Park, KS, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiff Penelope Hutchings filed this diversity action against Kevin M. Kuebler, M.D., P.A. alleging violations of the Kansas Act Against Discrimination (KAAD) and various common law claims arising out of her employment with defendant. This matter is presently before the court on defendant's motion for summary judgment (Doc. # 21).

Specifically, plaintiff alleges that defendant discriminated against her and subjected her to a hostile work environment on the basis of both an actual disability and a perceived disability in violation of the KAAD. Plaintiff also claims that defendant failed to accommodate her alleged disability and then retaliated against her for requesting an accommodation. Finally, plaintiff asserts several common law claims against defendant, including breach of an implied contract, wrongful discharge in violation of public policy and intentional infliction of emotional distress.

Defendant Kevin M. Kuebler, M.D., P.A. seeks summary judgment on all of plaintiff's claims. For the reasons set forth below, defendant's motion is granted and plaintiff's case is dismissed in its entirety.

1. In accordance with the applicable summary judgment standard, the facts are uncontroverted or related in the light most favorable to plaintiff.

2. Although not relevant to the court's analysis, plaintiff apparently first requested and received

## I. Facts[1]

Kevin M. Kuebler M.D., P.A. is a small professional corporation of doctors. The principals and shareholders of the corporation are Kevin M. Kuebler, M.D., Andrew Schwartz, M.D. and Brian Castlemain, M.D. Plaintiff Penelope Hutchings began her employment with defendant in April 1992 as an insurance clerk. Plaintiff's job responsibilities included, *inter alia*, filing insurance claims, dealing with Medicare, answering phones, scheduling appointments, and escorting patients to examination rooms. At some point during her employment, plaintiff's job duties expanded and she began cleaning examination rooms.

The first two years of plaintiff's employment passed without incident. In 1994, plaintiff learned her son had AIDS. In April 1994, plaintiff informed defendant of her son's illness and requested a modified work schedule. Specifically, plaintiff requested to work half days on Fridays so that she could travel to Chicago to visit her son. Defendant granted plaintiff's request.[2] In fact, Dr. Schwartz advised plaintiff of the arrangements in a memorandum which stated, in relevant part, as follows:

> Management is aware that your son, residing in Chicago, has reached the final stages of a fatal disease. We recognize your need to communicate with and visit your son during this critical period. We furthermore realize that this is a unique situation outside the normal scope of our personnel policies. We therefore are making special arrangements to meet this special situation as follows:
>
> 1) You will be allowed two (2) days paid time off per month for the purposes of visiting your son. Such time off will not be charged against your regularly scheduled paid time off allotment for vacation, holidays, sick leave, etc.

time off from the office manager. Plaintiff did not make a specific request to one of the doctors until July or August of 1994. In any event, it is undisputed that defendant granted her request on both occasions.

In addition, plaintiff was permitted to use the company phones for long distance calls to her son and his health care providers. Finally, Dr. Schwartz indicated that management would review the situation in six months to determine whether continued arrangements would need to be made.

Despite defendant's apparent sympathy for plaintiff's situation, plaintiff claims that between April 1994 and January 1995, she overheard Drs. Kuebler and Schwartz make "jokes" about persons with AIDS. According to plaintiff, the doctors commented that they would not treat anybody with AIDS that came into the emergency room and that anyone who associated with a person who had AIDS would probably end up HIV positive. Plaintiff testified that she overheard these kinds of comments on 3 or 4 occasions during the 9-month period. Plaintiff admitted, however, that these statements were not directed at her and, in fact, that the doctors probably thought she could not hear the statements.

Plaintiff's son died in October 1994. Plaintiff made no other requests for modifications of her work schedule or other accommodations until February 1995.

Plaintiff testified that she did not have any problems performing her job duties during 1994. Other than leaving early on Friday afternoons to visit her son, she was working full work weeks throughout the year. Moreover, plaintiff had no problems caring for herself. Plaintiff also testified that she did not experience any problems with her memory or concentration and that she did not have any suicidal ideation. Plaintiff did, however, report "some" decrease in appetite and found herself crying approximately once a month.

On or about February 20, 1995, plaintiff submitted to Dr. Schwartz a letter from her psychiatrist, Dr. Pol. The letter stated, in its entirety, as follows:

To Whom It May Concern:

Penny Hutchings is under our care. We have recommended to Penny that, if possible, she work part time for four to six weeks. Thank you.

Apparently, plaintiff did not receive an immediate response from Dr. Schwartz concerning the request for part-time employment. On several occasions after submitting the letter, plaintiff asked Dr. Schwartz whether he had made a decision with respect to the request. Dr. Schwartz replied that he had not had the time to address the issue and needed to discuss it with the other doctors.

According to plaintiff, defendant's doctors began harassing her shortly after she submitted the letter from Dr. Pol. Specifically, plaintiff claims that she was told on one occasion that she was being rude to patients and, on two or three occasions, that she was not cleaning the office properly. The doctors also informed plaintiff that her doctor visits were interfering with her office duties.[3] Finally, Dr. Schwartz told plaintiff that her "attitude had changed."

On March 8, 1995, plaintiff was hospitalized for suicidal ideation and major depression. According to plaintiff, prior to her hospitalization, plaintiff did not have any problems performing her job duties. In fact, during 1995, plaintiff had worked from 8 a.m. to 5 p.m. five days each week. Plaintiff testified that she did not experience any problems with her memory and did not have any suicidal ideation. She was crying at home more often than before (approximately 2 to 3 times per week) and was experiencing changes in her sleeping and eating habits. Despite these changes, plaintiff did not consider herself impaired.

On or about March 20, 1995, plaintiff returned to work.[4] Upon her return to work,

3. It is unclear from the record how often plaintiff visited the doctor during this period. A short term disability form submitted by plaintiff, however, indicates that plaintiff saw her doctor 13 times between May 1994 and March 9, 1995. It is also unclear from the record whether defendant had any knowledge of the subject matter of plaintiff's visits to the doctor.

4. During her hospitalization, Dr. Schwartz sent plaintiff a letter which read:

Dear Penny,
In light of your current situation, we are placing you on medical leave of absence to enable you to concentrate on your personal health matters. When you feel you are in a position to return, please call me first to discuss your situation. If you have any questions of [sic] comments, please let me know. Best wishes.

plaintiff submitted another letter from Dr. Pol in which he again recommended part-time employment for plaintiff. Specifically, Dr. Pol stated:

Penelope Hutchings is under my care in Shawnee Mission Medical Center and it is my recommendation that she not work 8 hours a day at this time.

I strongly feel that 5 or 6 hours a day would be much better for the next few weeks.

Any questions can be directed to my office (913) 677 0500.

In response to this request, defendant granted plaintiff four weeks of part-time employment. In a letter memorializing the arrangement, Dr. Schwartz stated:

As per your discussion regarding your need for post hospitalization therapy, we did receive a letter from Dr. Pol recommending that you work part-time for the next four to six weeks so that you can have follow-up counseling. In discussing these recommendations with both legal counsel and my associates, we will extend to you part-time employment for the next four weeks. If it goes beyond that, because the position of insurance clerk needs to be full time and you cannot accommodate the office demands, we will need to look for someone to fill this vacancy who can work on a full time basis.

At the time she received the letter, plaintiff believed she would return to full-time employment by April 14, 1995.

According to plaintiff, defendant's doctors continued to harass her when she returned to work after her one-week hospitalization. Specifically, Dr. Schwartz told her to wear rubber gloves when she was cleaning the examination rooms, although plaintiff concedes this request may have been for her own protection. She overheard Dr. Schwartz make a comment about "being in the loony bin" and about plaintiff "being on heavy drugs." Moreover, Dr. Schwartz apparently told a former employee of defendant that plaintiff had been hospitalized in the "psych ward." Plaintiff also testified that she was

accused of opening the doctors' private cabinet and, when she denied doing so, was called a "liar." Finally, plaintiff was questioned about what she did with cash payments received from patients and how she was keying in different charges for Medicare billing. Plaintiff concedes, however, that defendant may have had a legitimate business interest in understanding how cash payments were deposited and how certain Medicare charges were billed.

According to plaintiff, she did not have any problems performing her job duties after her hospitalization. Plaintiff testified that she did not have any problems caring for herself. In fact, plaintiff testified that she was sleeping better, eating better and crying less often than before her hospitalization. She did not experience any memory or concentration problems and did not have any suicidal ideation. Plaintiff testified that she did not consider herself impaired in any way.

On April 14, 1995, despite her professed ability to perform her job, plaintiff placed a copy of two notes on each of the doctor's desks. The first note informed the doctors that plaintiff intended to seek short term disability benefits. Specifically, the note read:

It is my Doctor's opinion that in my present mental/emotional condition I am temporarily disabled and unable to work. I will continue with medical treatment until such time I have regained my health and am able to return to work.

In the mean time, I have filled out an insurance claim for Short Term Disability and have enclosed herewith. Please advise when you have completed the section of the claim for "Employer."

The second note read:

To All Doctors:

I tried the best I could. But being called a liar by Dr. Schwartz And [sic] Dr. Kuebler telling me He [sic] voted me fired, and finding out all the secrets going on for instance like dont [sic] give Penny any

---

The medical leave of absence apparently ended when plaintiff returned to work immediately upon her discharge from the hospital.

checks if the [sic] come to the office, just put them away and give them to alyison. I cant [sic] take the stress any more.

My doctor has put me on Short Trem [sic] Disability.

Although plaintiff apparently intended to return to work when she "regained her health," defendant believed plaintiff had voluntarily terminated her employment as of April 14, 1995. In any event, plaintiff's employment with defendant was terminated as of April 14, 1995.

## II. Summary Judgment Standard

When considering a motion for summary judgment, the court must examine all of the evidence in the light most favorable to the nonmoving party. *Jones v. Unisys Corp.*, 54 F.3d 624, 628 (10th Cir.1995). A moving party that also bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 536 (10th Cir.1995). If the moving party does not bear the burden of proof at trial, it must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant meets these requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmovant may not merely rest on the pleadings to meet this burden. *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. Summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Plaintiff's KAAD Claims

In her complaint, plaintiff alleges that defendant discriminated against her and harassed her on the basis of both an actual disability and a perceived disability. In addition, plaintiff maintains that defendant failed to accommodate her alleged disability and then retaliated against her after she requested an accommodation.

As set forth in more detail below, the court concludes that plaintiff does not have a "disability" within the meaning of the KAAD. Thus, summary judgment is granted on plaintiff's discrimination, harassment and failure to accommodate claims. Moreover, the court concludes that plaintiff has failed to establish that defendant retaliated against her for requesting an accommodation. Thus, the court grants defendant's motion for summary judgment on plaintiff's retaliation claim.[5]

### A. Disability Discrimination

The KAAD prohibits a covered entity from discriminating against a "qualified individual with a disability" because of the individual's disability with respect to terms, conditions, and privileges of employment. *See, e.g.*, K.S.A. § 44–1009(a)(8). A "qualified individual with a disability" is an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires. Kan.Admin.Regs. 21–34–1(i).

Thus, to establish a claim of discrimination under the KAAD, plaintiff must demonstrate that: (1) she is disabled within the meaning of the KAAD; (2) she is qualified, that is, with or without reasonable accommodation (which she must describe), she is able

---

5. Defendant also contends that it is not a covered employer within the meaning of the KAAD because it does not have the requisite number of employees. *See* K.S.A. § 44–1002(b) (defining "employer" as any person employing four or more persons). According to defendant, shareholders of a professional corporation should be considered employers for purposes of the anti-discrimination laws and, thus, should not be counted as employees for purposes of the jurisdictional threshold. In light of the court's rulings with respect to the merits of plaintiff's KAAD claims, the court will assume, without deciding, that defendant is a covered employer.

to perform the essential functions of the job; and (3) that the defendant terminated her employment because of her disability. *See Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 897 (10th Cir.1997) (citing *Siemon v. AT & T Corp.*, 117 F.3d 1173, 1175 (10th Cir. 1997); *White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir.1995)); *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1443 (10th Cir.1996).[6] Defendant contends that plaintiff has failed to establish each of these three elements and, thus, summary judgment is appropriate. As set forth in more detail below, the court concludes that plaintiff does not have a "disability" within the meaning of the KAAD. Thus, summary judgment in favor of defendant on plaintiff's discrimination claim is appropriate.

Under the KAAD, a "disability" is defined as "(1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment by the person or entity alleged to have committed the unlawful discriminatory practice complained of." K.S.A. § 44–1002(j). Plaintiff relies upon subsections (1) and (3) of § 44–1002(j) in an effort to establish that she is disabled under the KAAD. Specifically, plaintiff alleges that her depression is a mental impairment that constitutes a disability and, alternatively, that defendant regarded her as having a disability (*i.e.*, major depression). The court will address each of plaintiff's arguments in turn.

1. Actual Disability

■ As set forth above, plaintiff alleges that defendant discriminated against her on the basis of an actual disability—major depression. To avail herself of the benefits of the KAAD under this theory, plaintiff must first demonstrate that her depression "sub-

stantially limits one or more of [her] major life activities." *See* K.S.A. § 44–1002(j)(1).[7]

The KAAD does not define either "substantially limits" or "major life activity." According to the regulations implementing the KAAD, "major life activities" include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Kan.Admin.Regs. 21–34–1(g). In order for an impairment to be considered "substantially limiting," the individual must be

(1) unable to perform a major life activity that the average person in the general population can perform; or

(2) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Kan.Admin.Regs. 21–34–1(k). The following factors should be considered in determining whether an individual is substantially limited in a major life activity:

(1) the nature and severity of the impairment;

(2) the duration or expected duration of the impairment; and

(3) the permanent or long term impact of the impairment, or the expected permanent or long impact of the impairment.

Kan.Admin.Regs. 21–34–17(a).

The court has found no evidence in the record that at the time plaintiff left her employment her depression substantially limited any of her major life activities. In fact, plaintiff does not even allege that her depression substantially limited any of her major life activities.[8] Rather, plaintiff simply de-

---

6. Federal court decisions analyzing and interpreting the ADA are persuasive authority in analyzing plaintiff's KAAD claims. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 n. 3 (10th Cir. 1997) (applying same standards and burdens to plaintiff's ADA claims and KAAD claims) (citing *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 767, 648 P.2d 234 (1982)).

7. The parties agree that plaintiff's condition constitutes a "mental impairment" within the meaning of the KAAD. *See* Kan.Admin.Regs. 21–34–1(h)(2).

8. Despite plaintiff's failure to articulate any theory with respect to whether her depression substantially limits any of her major life activities, the court has examined and considered the entire record in an effort to uncover evidence which

clares in a conclusory fashion that she is disabled. In support of her conclusion, plaintiff highlights the letters from Dr. Pol in which he recommends part-time employment. The court assumes, then, that plaintiff's theory is that her depression substantially limited her ability to work.

To demonstrate that an impairment substantially limits the major life activity of working, an individual must show a significant restriction in the "ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Kan.Admin.Regs. 21–34–18(a).

Significantly, plaintiff has not submitted any evidence for a reasonable factfinder to conclude that her depression significantly restricted her ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. *See Siemon v. AT & T Corp.*, 117 F.3d 1173, 1176 (10th Cir.1997) (plaintiff suffering from severe depression and anxiety did not have a "disability" within meaning of ADA where plaintiff failed to allege or demonstrate that the condition prevented him from performing a class of jobs or a broad range of jobs in various classes). Although plaintiff attempts to support her claim with the letters from Dr. Pol recommending part-time employment, these letters do not address whether plaintiff was significantly restricted in her ability to perform a class of jobs. In fact, the letters do not even suggest that plaintiff was significantly restricted in her ability to perform her current job; rather, the letters merely recommend part-time em-

ployment for a limited duration without any explanation.[9]

Moreover, plaintiff testified that she did not have any problems performing her job duties either before or after her one-week hospitalization. Before her hospitalization, plaintiff was able to work five days per week, from 8 a.m. to 5 p.m., without limitation. After her hospitalization, although plaintiff was working fewer hours, she believed she was successfully performing her job duties without limitation. In short, plaintiff did not consider herself impaired in any respect. In light of plaintiff's testimony, and in the absence of any evidence suggesting otherwise, the court concludes that plaintiff does not have a "disability" within the meaning of subsection (1) of K.S.A. § 44–1002(j). *See Bacon v. Great Plains Mfg., Inc.*, 958 F.Supp. 523, 530 (D.Kan.1997) (plaintiff diagnosed with and hospitalized for major depression not "disabled" within meaning of ADA where plaintiff believed he was "getting along well" in his job and resumed full duties at work after hospitalization). Accordingly, the court grants defendant's motion for summary judgment with respect to plaintiff's discrimination claim to the extent her claim is based on an actual disability.

2. "Regarded As" Disabled

 Plaintiff also contends that defendant "regarded" her as having a disability (*i.e.*, major depression). The regulations implementing the KAAD explain that a person is "regarded as" having an impairment that substantially limits a major life activity if she

(1) has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting a limitation;

(2) has a physical or mental impairment that substantially limits major life activi-

---

might broadly be seen as helpful to her claim. *See Ricks v. Xerox Corp.*, 877 F.Supp. 1468, 1474 & n. 7 (D.Kan.1995) (undertaking a similar review to "ensure that [plaintiff] is not deprived of [her] day in court simply because [her] counsel has not marshaled the evidence in the manner contemplated by summary judgment practice and applicable rules.").

**9.** Plaintiff also directs the court to her short term disability form as evidence of her disability. The

form, however, does not speak to the issue of whether plaintiff's depression substantially limited any of plaintiff's major life activities. The form simply indicates that plaintiff was partially disabled from March 16, 1995 through April 14, 1995 and that plaintiff was totally disabled after April 14, 1995. Finally, the form indicated that plaintiff would be "unable to work" until August 30, 1995.

ties only as a result of the attitudes of others toward the impairment; or

(3) has none of the impairments defined [in the regulations] but is treated by a covered entity as having an impairment.

Kan.Admin.Regs. 21–34–1(e). Thus, " 'a person is "regarded as having" an impairment that substantially limits the person's major life activities when other people treat the person as having a substantially limiting impairment,' regardless of whether the individual actually has an impairment." *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 903 (10th Cir.1997) (quoting *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1444 (10th Cir.1996) (quoting *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995))). In essence, the *"focus is on the impairment's or the perceived impairment's effect upon the attitudes of others." Id.* For the reasons set forth below, the court finds plaintiff has failed to come forward with sufficient evidence that the defendant "regarded" her as disabled.[10]

According to plaintiff, defendant "regarded" her as disabled because it "accepted without question that plaintiff had a medical condition that justified accommodation." In support of her claim, plaintiff emphasizes that defendant never required plaintiff to submit a doctor's certification about her alleged disability and did not ask or require plaintiff to undergo a medical examination. Plaintiff also highlights Dr. Schwartz's "looney bin" comment and his discussion with a former employee about plaintiff's hospitalization.

Construing the facts in a light most favorable to plaintiff, the court concludes that plaintiff has not produced evidence from which a reasonable factfinder could conclude that defendant regarded plaintiff's depression as substantially limiting any of her major life activities. Because plaintiff fails to articulate any theory with respect to which major life activity defendant regarded as substantially limited, the court assumes that plaintiff is claiming that defendant regarded her depression as substantially limiting her ability to work.[11]

In order to establish a "disability" under the "regarded as" prong of the KAAD with respect to the major life activity of working, plaintiff must establish that defendant regarded her as substantially limited in her ability to perform either a class of jobs or a broad range of jobs. *Sutton v. United Air Lines*, 130 F.3d 893, 904 (10th Cir.1997); *MacDonald v. Delta Air Lines, Inc.*, 94 F.3d 1437, 1445 (10th Cir.1996). Plaintiff cannot make this showing. Defendant's decision to grant plaintiff's request for part-time employment "without question" simply does not suggest (nor does plaintiff allege) that defendant "regarded" plaintiff as substantially limited in her ability to perform a class of jobs or a broad range of jobs.[12]

The uncontroverted facts indicate only that defendant granted plaintiff's request to work part-time for four weeks following her hospi-

---

**10.** Plaintiff also claims that she was regarded as having AIDS, although her argument with respect to this theory is somewhat unclear. To the extent plaintiff's argument is based on Dr. Schwartz telling plaintiff to wear gloves while cleaning the examination rooms, the argument is unpersuasive. In her deposition, plaintiff conceded that the request could have been for her own protection. Moreover, the uncontroverted facts demonstrate that Dr. Schwartz knew about plaintiff's son having AIDS long before he told plaintiff to wear gloves while cleaning the examination rooms.

To the extent plaintiff's argument is based on the alleged comments made by Drs. Kuebler and Schwartz regarding AIDS, the argument is similarly unpersuasive. Plaintiff conceded that the comments were not directed at her and, in any event, the comments do not indicate (nor does plaintiff allege) that the doctors regarded plaintiff

as having AIDS or being otherwise impaired because of her association with her son.

**11.** The court makes this assumption based on plaintiff's deposition testimony in which she claims defendant began criticizing her work performance after plaintiff requested an accommodation.

**12.** Even if the evidence suggested that defendant regarded plaintiff as substantially limited in her ability to perform the insurance clerk position, such evidence would be insufficient to support a claim under the "regarded as" prong of the KAAD. *See Sutton,* 130 F.3d at 904 ("An employer does not necessarily regard an employee as substantially limited in the major life activity of working simply because it believes that individual is incapable of performing a particular job.").

talization for depression. Plaintiff's argument that defendant should now be held liable for "regarding" her as disabled because it granted her accommodation request is ludicrous. As this court has previously recognized, the definition of "disability" does not encompass this situation:

> If courts were to interpret the ADA to hold otherwise, employers would be discouraged from attempting to work with people who, though not actually disabled, feel themselves in need of some special treatment from their employer to help them obtain or keep their jobs. Moreover, a contrary interpretation would permit a sort of bootstrap definition of disability by which plaintiffs could seek redress under the ADA based on their own unilateral perception that they are disabled even when they do not meet the legal definition as long as their employer was initially sympathetic.

*Gaddy ex rel. Gaddy v. Four B Corp.*, 953 F.Supp. 331, 338 (D.Kan.1997).

Similarly, Dr. Schwartz's conduct, while insensitive, falls far short of establishing (and plaintiff does not even allege) that defendant "regarded" plaintiff as substantially limited in her ability to perform a class of jobs or a broad range of jobs. In fact, plaintiff does not even allege that defendant regarded her as incapable of performing the insurance clerk position. Viewing the evidence in the light most favorable to plaintiff, she can establish only that Dr. Schwartz was perhaps insensitive to plaintiff's condition. This evidence fails to establish that plaintiff was disabled under the "regarded as" definition found at K.S.A. § 44–1002(j)(3). Thus, defendant's motion for summary judgment is granted with respect to plaintiff's "regarded as" claim.

### B. Disability Harassment—Hostile Work Environment

■ Plaintiff also claims that she was subjected to a hostile work environment based on her disability or perceived disability. To establish a prima facie case of disability harassment, plaintiff must show that (1) she is a qualified individual within the meaning of the KAAD; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability or request for an accommodation; and (4) the harassment altered a term, condition, or privilege of her employment and created an abusive working environment. *See Butler v. City of Prairie Village*, 974 F.Supp. 1386, 1403 (D.Kan.1997). *See also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1409 n. 8 (10th Cir.1997) (assuming without deciding that the KAAD provides for a hostile environment claim on the basis of disability).

As set forth above, the court concludes that plaintiff is not a qualified individual within the meaning of the KAAD because she does not have a "disability" as that term is defined in the KAAD. Thus, plaintiff cannot satisfy the first element of her prima facie case of disability harassment. Defendant's motion for summary judgment on plaintiff's hostile work environment claim is granted.

### C. Failure to Accommodate

■ Plaintiff also claims that defendant violated the KAAD when it refused to accommodate her disability. Specifically, plaintiff argues that defendant ignored her initial request for part-time employment and then, in response to her second request, allowed her to work part-time for only a limited duration. In order to establish a claim for failure to accommodate a disability, plaintiff must show that (1) she is a qualified individual within the meaning of the KAAD; (2) defendant was aware of her disability; (3) she requested a reasonable accommodation; and (4) defendant denied her request for a reasonable accommodation. *See Butler v. City of Prairie Village*, 974 F.Supp. 1386, 1401 (D.Kan. 1997).

As set forth above, the court concludes that plaintiff is not a qualified individual within the meaning of the KAAD because she does not have a "disability" as that term is defined in the KAAD. Thus, plaintiff cannot satisfy the first element of her prima facie case of failure to accommodate a disability. Defendant's motion for summary judgment on plaintiff's failure to accommodate claim is granted.

*D. Retaliation*

■ Finally, plaintiff contends that defendant harassed her and ultimately terminated her employment in retaliation for requesting an accommodation. The court analyzes plaintiff's retaliation claim under the familiar burden-shifting framework first pronounced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1403 & n. 3 (10th Cir.1997) (analyzing plaintiff's KAAD claims under *McDonnell Douglas* framework) (citing *Woods v. Midwest Conveyor Co.*, 231 Kan. 763, 767, 648 P.2d 234 (1982)). In the summary judgment context, plaintiff initially must raise a genuine issue of material fact on each element of her prima facie case of retaliation. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir.1997).

■ Once plaintiff establishes her prima facie case, the burden shifts to defendant to offer a legitimate nondiscriminatory reason for its employment decision. *Id.* (citing *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995)). If the defendant "comes forward with a nondiscriminatory reason for its actions, the burden then reverts to the plaintiff to show that 'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief.'" *Id.* (quoting *Randle*, 69 F.3d at 451). A showing of pretext "gets plaintiff 'over the hurdle of summary judgment.'" *Id.* (quoting *Randle*, 69 F.3d at 452 (quoting *Ingels v. Thiokol Corp.*, 42 F.3d 616, 622 n. 3 (10th Cir.1994))).

■ To establish a prima facie case of retaliation under the KAAD, plaintiff must demonstrate that (1) she engaged in protected activity; (2) she suffered an adverse employment action either after or contemporaneous with her protected activity; and (3) a causal connection exists between her protected activity and the adverse employment action. *See Butler v. City of Prairie Village*, 974 F.Supp. 1386, 1402 (D.Kan.1997) (citing

*Morgan*, 108 F.3d at 1324; 42 U.S.C. § 12203(b)).

■ The court concludes that plaintiff engaged in protected activity sufficient to establish the first element of her prima facie case when she requested part-time employment. *See id.* (plaintiff may pursue a retaliation claim based on requesting accommodation provided that she had a good faith basis for believing she was entitled to the accommodation requested) (citing *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486 (10th Cir. 1996) (citing *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir.1984)), *cert. denied*, —— U.S. ——, 117 S.Ct. 1468, 137 L.Ed.2d 682 (1997)). It is questionable, however, whether plaintiff has made a sufficient showing on the second and third elements of her prima facie case.

■ Even assuming that plaintiff has established a prima facie case of retaliation, she has failed to raise any inference of pretext. Defendant has offered a legitimate, nondiscriminatory reason for terminating plaintiff after four weeks of part-time employment— the need for a full-time insurance clerk.[13] Plaintiff has not attempted to offer any evidence to refute defendant's explanation and, in fact, does not even argue that defendant's explanation is pretextual. Plaintiff merely asserts that defendant's conduct was discriminatory. Such an assertion is insufficient to overcome defendant's legitimate nondiscriminatory explanation for its actions. *Id.* (citing *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir.1988) (mere conjecture that an employer's explanation is a pretext for intentional discrimination is insufficient to satisfy a plaintiff's pretext burden)). *See also Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir.1997) (affirming summary judgment on ADA retaliation claim where plaintiff "has not cast doubt on [defendant's] facially nondiscriminatory explanation for its actions.").

Moreover, there is simply no evidence in the record that defendant retaliated against plaintiff for requesting an accommodation. The uncontroverted facts indicate that defen-

---

**13.** For purposes of analyzing plaintiff's retaliation claim, the court assumes without deciding

that defendant terminated her employment at the end of the four-week period.

dant granted plaintiff's request for a modified work schedule during her son's illness and granted plaintiff's request for part-time employment after her hospitalization for depression. Plaintiff has not produced any evidence from which a reasonable factfinder could conclude that defendant retaliated against plaintiff because of her request for accommodations.[14]

For these reasons, defendant is entitled to summary judgment on plaintiff's retaliation claim.

## IV. Breach of Contract

Plaintiff also alleges that defendant breached an implied contract of employment. She articulates two separate theories with respect to this claim. First, plaintiff argues that defendant breached an implied contractual obligation to comply with the provisions of the KAAD. Second, plaintiff argues that defendant breached its alleged contractual obligation to review the accommodations made with respect to plaintiff's work schedule. For the reasons set forth below, the court concludes that plaintiff cannot maintain a cause of action for breach of implied contract against defendant under either theory. Accordingly, the court grants defendant's motion for summary judgment on this claim.[15]

 According to plaintiff, defendant had an implied contractual obligation to comply with the KAAD and it breached this implied contract when it allegedly violated the KAAD by discriminating against plaintiff. The court has already concluded as a matter of law, however, that plaintiff was not "disabled" within the meaning of the KAAD and that defendant did not violate the KAAD in any respect. Thus, even assuming that such a contractual obligation existed, defendant did not breach the alleged contract. Thus, plaintiff's implied contract claim fails to the extent it is based on defendant's alleged contractual obligations under the KAAD.

 Plaintiff also alleges that defendant breached a contractual obligation to review the modifications made to plaintiff's work schedule based on her son's illness. Specifically, plaintiff highlights the memorandum in which defendant allowed plaintiff two days paid time off per month for the purpose of visiting her son in Chicago. Dr. Schwartz indicated in the memorandum that management would review the modifications made to her work schedule after six months to determine whether continued arrangements would need to be made. According to plaintiff, defendant breached this promise when it failed to review the situation after six months had elapsed. The court disagrees. It is uncontroverted that plaintiff's son died approximately two months after the memorandum was written. Thus, even assuming a contractual obligation existed to review the arrangements made, which is doubtful in light of the lack of any apparent consideration for this otherwise gratuitous gesture, the sole reason for modifying plaintiff's work schedule (i.e., to allow plaintiff to visit her son in Chicago) had dissipated. In the absence of any showing to the contrary, no further follow up with respect to plaintiff's work schedule was called for in light of the change in circumstances.

For the reasons set forth above, the court grants defendant's motion for summary judgment on plaintiff's implied contract claim.

## V. Retaliatory Discharge in Violation of Public Policy

 Plaintiff claims that defendant discharged her in violation of Kansas public policy. The tort of retaliatory discharge is an exception to the long-standing Kansas

---

14. With respect to defendant's alleged harassment of plaintiff after she requested part-time employment (e.g., asking her to wear rubber gloves, accusing her of opening a private cabinet, and questioning her about cash payments and Medicare billing procedures), plaintiff concedes that defendant had a legitimate business reason for its inquiries.

15. Plaintiff also bases her implied contract claim on defendant's alleged failure to pay plaintiff certain wages for accrued vacation time, accrued sick leave and hours worked upon plaintiff's termination. Defendant's alleged failure to pay certain wages was also the subject of a separate statutory claim that has since been resolved by the parties. Thus, the court need not address plaintiff's implied contract claim to the extent it is based on alleged nonpayment of wages.

rule that an employee can be terminated with or without cause at any time. *Aiken v. Business & Indus. Health Group, Inc.,* 886 F.Supp. 1565, 1573 (D.Kan.1995) (citing *Murphy v. City of Topeka,* 6 Kan.App.2d 488, 493–96, 630 P.2d 186 (1981); *Cain v. Kansas Corp. Comm'n,* 9 Kan.App.2d 100, 103, 673 P.2d 451 (1983)). The exception is a narrow one and applies only if the discharge seriously contravenes public policy. *Id.* (citing *Cain,* 9 Kan.App.2d at 104, 673 P.2d 451).

Kansas courts have limited a cause of action for retaliatory discharge in violation of public policy to two general circumstances: (1) where an employee is discharged in retaliation for exercising or intending to exercise his or her rights under workers' compensation laws; and (2) where an employee is discharged for good faith reporting or threatening to report the employer's serious infraction of rules, regulations, or law pertaining to public health, safety and the general welfare. *Id.* (citing *Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 176–77, 872 P.2d 252 (1994)).

█ Plaintiff's retaliatory discharge claim does not fall within either of these two categories. In support of her retaliatory discharge claim, plaintiff directs the court to the public policy of "equal and nondiscriminatory treatment of employees" found in the Americans with Disabilities Act, the Kansas Act Against Discrimination, the Family and Medical Leave Act, and the Rehabilitation Act.[16]

Because Kansas courts have not already recognized her wrongful discharge claim as an exception to the employment-at-will doctrine, plaintiff must show that the conduct on which her wrongful discharge claim is based is protected by Kansas public policy and no alternative state or federal remedy exists. *See Butler v. City of Prairie Village,* 961 F.Supp. 1470, 1474 (D.Kan.1997). This she cannot do. Clearly, plaintiff has an adequate remedy under the Kansas Act Against Discrimination. The Tenth Circuit has squarely decided that a plaintiff may not assert a common law cause of action for retaliatory discharge when the KAAD provides an adequate remedy:

> [W]e believe, as did the district court, that the Kansas Supreme Court would adopt the view that KAAD provides an adequate and exclusive state remedy for violations of the public policy enunciated therein. There is no evidence that the remedies provided for in KAAD are constitutionally inadequate to compensate plaintiff, or so inadequate to enforce the stated public policy as to require bolstering by a common law cause of action.

*Polson v. Davis,* 895 F.2d 705, 709–10 (10th Cir.1990) (citation omitted). *See also Braun v. Dillon Cos.,* No. 94–2079–EEO, 1995 WL 261142, at *10–11 (D.Kan. Apr.19, 1995) (dismissing plaintiff's common law retaliatory discharge claim because Title VII and the KAAD provide "exclusive remedies" for alleged injuries); *Emerson v. Boeing Co.,* No. 92–1279–MLB, 1994 WL 149191 at *5 (D.Kan. Apr. 1, 1994) (where same conduct supported plaintiff's claims of discrimination and state law retaliatory discharge, plaintiff's public policy claim precluded by availability of remedy under Title VII and KAAD); *Woods v. Century I, L.C.,* No. 92–2092–JWL, 1993 WL 105051, at *5 (D.Kan. Apr.9, 1993) (granting summary judgment for defendant on plaintiff's common law retaliatory discharge claim where plaintiff had available statutory remedies under Title VII and the KAAD). Accordingly, the court grants defendant's motion for summary judgment on plaintiff's retaliatory discharge claim.

## VI. Intentional Infliction of Emotional Distress

█ Finally, plaintiff claims that defendant's actions constitute intentional infliction of emotional distress. Kansas has set a very high standard for the common law tort of outrage. *Butler v. City of Prairie Village,* 974 F.Supp. 1386, 1406 (D.Kan.1997). Moreover, "Kansas courts have been reluctant to extend the outrage cause of action to discrim-

---

**16.** Plaintiff also alleges that defendant's conduct violated the public policy found in Kansas common law and various federal statutes with respect to the confidentiality of medical records. Although plaintiff claims that Dr. Schwartz dis- cussed her hospitalization with a former employee, the record is devoid of any evidence (or suggestion) that defendant disclosed medical records of plaintiff.

ination and harassment claims." *Bolden v. PRC Inc.*, 43 F.3d 545, 554 (10th Cir.1994). To establish a prima facie case of outrage, plaintiff must show that (1) defendant's conduct was intentional or in reckless disregard of plaintiff; (2) defendant's conduct was extreme and outrageous; (3) there is a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress is extreme and severe. *Id.* at 553 (citing *Moore v. State Bank of Burden*, 240 Kan. 382, 388, 729 P.2d 1205 (1986)); *Butler*, 974 F.Supp. at 1406. The threshold inquiries for the tort of outrage are whether "(1) the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery and (2) the emotional distress suffered by the plaintiff is so extreme the law must intervene because no reasonable person would be expected to endure it." *Bolden*, 43 F.3d at 553 (citing *Roberts v. Saylor*, 230 Kan. 289, 292–93, 637 P.2d 1175 (1981)).

▇ In support of her outrage claim, plaintiff alleges that she was subjected to "an almost daily practice of harassing, ignoring, lying, deception, unnecessary infliction of physical pain, wilful refusal to follow practices or review actions taken, and ultimately termination without notice, and job criticism without warning or write-up." Plaintiff analogizes her case to *Laughinghouse v. Risser*, 754 F.Supp. 836 (D.Kan.1990) and *Gomez v. Hug*, 7 Kan.App.2d 603, 645 P.2d 916 (1982).[17]

The facts in this case, however, are easily distinguished from *Laughinghouse* and *Gomez*. In *Laughinghouse*, the plaintiff was the victim of sexual harassment from her supervisor over a two-year period. 754 F.Supp. at 843. The harassment included screaming, cursing, unwanted touchings, sexual comments and fits of rage. *Id.* The conduct of plaintiff's supervisor was characterized as "a concerted effort to terrorize her and to intentionally break her spirit." *Id.* The court found that "the nature of the abuse coupled with its constancy" sufficiently supported an outrage claim. *Id.* at 844. In

*Gomez*, the plaintiff was subjected to vulgar, racist expressions and threats of violence resulting in possible serious medical problems. 7 Kan.App.2d at 610–11, 645 P.2d 916. *See also Miller v. Bircham, Inc.*, 874 F.Supp. 337, 341 (D.Kan.1995) (denying summary judgment on outrage claim where plaintiff was subjected to "multiple offensive touchings" and "multiple instances in which a fellow employee exposed his penis while making lewd comments to her").

Construing the facts in a light most favorable to plaintiff, the court concludes that plaintiff cannot maintain an outrage claim against defendant. To constitute sufficiently extreme and outrageous conduct, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society ." *Bolden*, 43 F.3d at 554 (citing *Roberts v. Saylor*, 230 Kan. 289, 293, 637 P.2d 1175 (1981)). Plaintiff has not alleged any conduct by defendant or its doctors which was so outrageous in character or so extreme in degree as to be beyond the bounds of decency or to be regarded as atrocious and utterly intolerable in a civilized society. *See Byle v. Anacomp, Inc.*, 854 F.Supp. 738, 747–48 (D.Kan.1994) (no claim of outrage where plaintiff felt threatened by her supervisor, was called on occasion a "bitch" by her supervisor, and supervisor monitored her comings and goings and evaluated her performance harshly). Thus, the court grants defendant's motion for summary judgment on plaintiff's outrage claim.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment (Doc. # 21) is granted. Plaintiff's case is dismissed in its entirety.

**IT IS SO ORDERED.**

---

17. The record simply does not support plaintiff's allegations of a "daily practice" of such conduct or any infliction of "physical pain."